[No. D004896. Fourth Dist., Div. One. May 31, 1988.]

MEHDI IMEN et al., Plaintiffs and Respondents, v.
HARRY WARNER GLASSFORD, Defendant and Appellant.

[Opinion certified for partial publication.[1]]

[1]Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of parts III, IV and V of the Discussion.

COUNSEL

Richard A. Sackett for Defendant and Appellant.

Lesley Ann Ash for Plaintiffs and Respondents.

## OPINION

**WIENER, Acting P. J.**—In this atypical real estate transaction, defendant Harry Warner Glassford, a licensed real estate salesman, named himself as copurchaser with Barbara Ward on the written agreement to buy the residence owned by the plaintiffs, Mehdi and Goltaj Imen (the Imens), in order to generate a real estate commission for himself. Shortly after the close of escrow, Glassford quitclaimed his interest in the property to Ward who promptly defaulted on secured notes which represented substantially all of the purchase price. The Imens then filed this action against Glassford, his principal and others seeking damages caused by their fraud, negligence and breach of contract in inducing them to sell their property on terms which Glassford had no intention of performing.

The Real Estate Commissioner, also concerned with Glassford's allegedly improper conduct, accused Glassford of violating his statutory duties. After a two-day hearing the administrative law judge found Glassford acted fraudulently—entering into a real estate contract with clients having no intention of performing his written promises. The Real Estate Commissioner adopted the findings of the administrative law judge and revoked Glassford's licenses as a real estate salesman and broker. The Imens later relied on the commissioner's decision in successfully moving for summary adjudication on the issue of Glassford's fraud. In an evidentiary proceeding under Code of Civil Procedure sections 585 and 636 the court awarded the Imens $98,808.77 compensatory damages, $40,000 punitive damages and $20,000 attorneys' fees.

Glassford appeals from the judgment entered on the court's findings. He argues the court erred in relying on the doctrine of collateral estoppel to summarily adjudicate his fraud, the antideficiency statutes preclude an award of compensatory and punitive damages and there is no legal basis on which to award attorneys' fees. We partially agree concluding the court applied the wrong measure of damages for Glassford's fraud and had no authority to award attorneys' fees. In computing damages Glassford is also entitled to the benefit of $17,500 representing the amount of the settlement paid to the Imens by the other defendants. We therefore reverse the judgment to permit a limited retrial on the issue of compensatory damages. In all other respects we affirm concluding in the circumstances of this case the doctrine of collateral estoppel was properly applied in summarily adjudicating Glassford's fraud and the antideficiency statutes do not preclude an award of tort damages.

PROCEDURAL AND FACTUAL BACKGROUND

I

The following verbatim recitation of part of the Real Estate Commissioner's decision revoking Glassford's licenses is not only to set out the details of the Imens' sale to Glassford and Ward, but to highlight the issues decided in the administrative proceeding necessary for our later discussion of collateral estoppel.

"This matter came on regularly for hearing before Ronald M. Gruen, Administrative Law Judge of the Office of Administrative Hearings, at San Diego, California, on October 13, 14, 1983, at 9:00 a.m. Robert Howell, Counsel, Department of Real Estate, represented the complainant. Respondent Harry Warner Glassford appeared in person and was represented by John Pasto, Attorney at Law. Oral and documentary evidence having been received and the matter submitted, the Administrative Law Judge finds by clear and convincing proof the following facts:

"I

"The Complainant, Carl Lewis, a Deputy Real Estate Commissioner of the State of California, filed the Accusation in his official capacity.

". . . . . . . . . . . . . . . . . .

"III

"At all times herein mentioned, respondent Glassford was licensed by the Department of Real Estate (hereinafter the Department) as a real estate

salesperson. On and after July 30, 1982, he was licensed by the Department as a real estate broker.

"...  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"PAULING PROPERTY [the Imens' Property]

"V

"On or about May 22, 1981, Mehdi and Goltha Imen (hereinafter the Sellers) were the owners of certain real property located at 4606 Pauling Avenue, San Diego, California (hereinafter the Property).

"VI

"On May 22, 1981, [Glassford's co-agent real estate salesman] Weiner obtained from the Sellers an Exclusive Authorization and Right to Sell agreement (hereinafter the Listing Agreement) under the terms of which, in relevant part, Weiner, on behalf of his employing broker, agreed to use diligence in procuring a purchaser for the Property; the Sellers agreed to pay a commission to Weiner's broker in the amount of 6% of total sales price, and Weiner's employing broker was authorized by the Seller to cooperate with subagents.

"VII

"On or about July 15, 1981, respondent Glassford, a co-employee of Weiner working for the same employing broker, procured from Barbara Ward (hereinafter the Buyer) a Real Estate Purchase Contract and Receipt for Deposit (hereinafter the Offer), under the relevant terms of which the Buyer offered to purchase the Property for a total price of $132,500 under certain terms and conditions. The Buyer put down a $500 deposit as earnest money for the offer.

"VIII

"After negotiation, a bargain was struck under the relevant terms of which the sales price would be $133,500; Buyer's down payment would be $500 cash and a $5,000 note payable in two years. Sellers would take back a third trust deed from Buyer in the amount of $36,150 at 12% interest and Sellers would obtain in their own name a $30,000 note and deed of trust secured by the Property, much of the proceeds of which would go for closing costs and commissions. Buyer would take the property subject to

the above mentioned $30,000 trust deed and would assume the $62,350 first trust deed.

## "IX

"When the Buyer failed to show that she could qualify for assumption of the $62,350 first trust deed, respondent Glassford promised Sellers to become a co-owner of the Property, together with the Buyer, in order to assist Buyer in qualifying for assumption of the first trust deed. Respondent Glassford also agreed with Sellers to guarantee payments on all three trust deeds. Escrow instructions were redrafted by respondent and Weiner to state falsely that the Buyer and respondent were putting $41,000 into escrow to induce the lender to allow assumption of the first trust deed by Buyer and respondent.

"Weiner was not shown to be a party to the false statement, in that he had no reason to know of or believe the false intentions on the part of the respondent.

## "X

"Escrow closed September 15, 1981. On October 5, 1981, respondent Glassford executed a quit-claim deed granting his interest in the Property to the Buyer. Said deed went unrecorded until November 5, 1981. Shortly thereafter the Buyer defaulted on all loans.

## "XI

"All actions of respondent Glassford were done for or in expectation of a compensation for performing acts for which a real estate license is required.

## "XII

"At no time has respondent Glassford made any payments on any of the notes secured by the Property despite demands to do so.

## "XIII

"At the time respondent Glassford agreed with Sellers that he would guarantee payment of the notes and would become a co-owner of the Property, he had no intention of performing the said promises.

## "XIV

"Because of the conduct of the respondent, the Sellers were deprived of the benefit of their bargain and their security interest in the Property was

placed in jeopardy of extinguishment. Further the lender secured by the 1st deed of trust was deceived into permitting the assumption of a loan they might not otherwise have done but for the conduct of the respondent.

"However, prior to foreclosure proceedings on the property by the secured lienholders, respondent and Weiner undertook to resell the property for the Sellers to a third party. The record is silent as to any financial or out-of-pocket loss to the Sellers as a result of such resale.

"XV

"Respondent contends that the only reason he promised Sellers to become co-owner of the property was to enable Barbara Ward to qualify for the assumption of the first trust deed loan, and that after escrow closed he intended to quit-claim his interest in the property to Ward or a third party investor. Respondent claims this was the understanding he had with Sellers and their agent Weiner, and further that Sellers knew that respondent had no intention of carrying through with his guarantee for payment on the three deeds of trust spelled out in the agreement between the parties.

"Such contentions are patently without merit and contrary to the clear weight of the evidence."

## II

In seeking a summary resolution of Glassford's liability, the Imens asked the court to take judicial notice of the Real Estate Commissioner's decision. The Imens also submitted a statement of material facts which were undisputed and supporting proofs in accordance with Code of Civil Procedure section 437c, subdivision (b). That statement, with appropriate references to the administrative decision, supporting declarations, or relevant depositions included the relationship between Glassford and his real estate broker, the details of Glassford's July 15, 1981, offer from Ward, the Imens' reliance on the offer and the later events resulting in Glassford's receipt of a commission and his relinquishment of his interest in the property.

Glassford's opposing declaration disagreed with the Imens' characterization of the transaction and the propriety of using the administrative hearing as the means to decide controverted facts. Glassford's opposing declaration explained that he was to "become a co-owner of the property in question along with Ms. WARD. . . . [intending] to only remain on title for a short

period of time"; that he "never made any representations to the plaintiffs[2] that [he] would guarantee payment on any trust deeds"; and that he had "fully and completely explained to the plaintiffs that [he] would only remain on title until Ms. WARD found an investor."

Glassford also declared: "I never made any representations to the plaintiffs that were not true. They were fully informed that I would only remain on title briefly and they indicated they had to sell the property no matter what the possible consequences were. [¶] I never made any statements that I had no intention of performing my legal obligations incurred from the transaction in question. As a real estate broker at that time I was fully aware of my legal responsibilities in becoming a co-signor on a note and trust deed. [¶] I did not make any representations of any kind to the plaintiffs which were not true. No representations were made to induce them to go forward with the purchase which were not true."

The court used the findings contained in the administrative decision in summarily adjudicating Glassford's liability based on fraud. Following this determination the Imens settled with the other defendants and gave Glassford notice of the court date in which they intended to establish their damages for fraud. Glassford, acting as his own counsel, appeared at that hearing. Both he and Mehdi Imen testified. Based on the evidence presented the court awarded damages as set forth above.

## DISCUSSION

### I

Relying on *Parklane Hosiery Co.* v. *Shore* (1979) 439 U.S. 322 [58 L.Ed.2d 552, 99 S.Ct. 645] and his state constitutional right to a trial by jury (Cal. Const., art. I, § 16), Glassford contends that summary adjudication of his liability is simply wrong. In making this argument Glassford overlooks the rationale of *Parklane* and ignores California precedent which must control our decision.

We first wish to acknowledge that the application of the doctrine of collateral estoppel is not the sine qua non for efficient use of the courts. Obviously there are times when its application will promote the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing that issue into controversy

---

[2] For some reason the declaration of Harry Warner Glassford uses the singular possessive where clearly the plural nonpossessive is intended. For the sake of clarity we have corrected each of these references in the quotations.

(*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 811 [122 P.2d 892]) and by avoiding inconsistent judgments which are contrary to our perception of the judicial system (*People* v. *Taylor* (1974) 12 Cal.3d 686, 695 [117 Cal.Rptr. 70, 527 P.2d 622]). There are other occasions, however, when the need for efficiency and judicial economy must be subordinated to a party's right to a fair adversary hearing in which the party will be given the opportunity to fully present his or her case.

In *Parklane Hosiery Co.* v. *Shore, supra,* 439 U.S. 322, the United States Supreme Court emphasized that courts must go through a careful weighing process to determine the fairness of applying the doctrine of collateral estoppel. In explaining the problems associated with the offensive use of collateral estoppel contrasted with its defensive use, *Parklane* cautioned that offensive use may be both inefficient and unfair to a defendant.

"If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. [Citations.] Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." (At pp. 330-331 [58 L.Ed.2d at pp. 561-562].)

*Parklane* nonetheless held that the offensive use of collateral estoppel was permitted in the broad discretion of the trial court except in certain circumstances including the situation when its application "*would be unfair to a defendant.*" (*Ibid.*; italics added.)

In reaching this conclusion *Parklane* stated that in considering whether the earlier finding could be used "the presence or absence of a jury as factfinder is basically neutral." (*Id.* at p. 332, fn. 19 [58 L.Ed.2d at p. 563].)

In *People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321] the California Supreme Court expressed concerns similar to those articulated in *Parklane* in discussing whether a decision reached in an administrative proceeding could serve as the basis for collateral estoppel in a later trial. Relying on federal precedent (*United States* v. *Utah Const. Co.* (1966) 384 U.S. 394 [16 L.Ed.2d 642, 86 S.Ct. 1545]) *Sims* held that the decision to use collateral estoppel turns on whether the administrative agency acted in a judicial capacity and resolved disputed issues of fact which the parties had an adequate opportunity to litigate. (*Sims* at p. 479.) In determining whether the agency had acted in a "judicial capacity" the court must consider the

presence of "factors indicating that the administrative proceedings and determination possessed a ' "judicial" character.' " (*Ibid*.) These factors include whether (1) the administrative hearing was conducted in a judicial-like adversary proceeding; (2) the proceedings required witnesses to testify under oath; (3) the agency determination involved the adjudicatory application of rules to a single set of facts; (4) the proceedings were conducted before an impartial hearing officer; (5) the parties had the right to subpoena witnesses and present documentary evidence; and (6) the administrative agency maintained a verbatim record of the proceedings. (*Id*. at pp. 479-480.) Additional factors include whether the hearing officer's decision was adjudicatory and in writing with a statement of reasons. Finally, was that reasoned decision adopted by the director of the agency with the potential for later judicial review. (*Ibid*; see also 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 241, pp. 677-680.)

■ In this case each factor identified in *Sims* as important to a determination of "judicial capacity" is present.

Business and Professions Code section 10100 provides that before suspending or revoking any real estate license the real estate department must proceed under the provisions relating to administrative adjudication set out in Government Code section 11500 et seq. By definition Glassford received an adjudicatory hearing (Gov. Code, § 11500, subd. (f)). An adjudicatory hearing requires that testimony must be received under oath, the right to cross-examine and confront adversary witnesses, the right to representation and a formal decision. (Gov. Code, § 11500, subds. (f)(1)(2)(3) and (4)). After the hearing the administrative law judge makes recommendations to the commissioner who may accept or reject them. (Gov. Code, § 11517; *Rylander* v. *Karpe* (1976) 60 Cal.App.3d 317, 320 [131 Cal.Rptr. 415].) In addition a licensee dissatisfied with the administrative decision can compel judicial review (Gov. Code, § 11523; see *Ryander* v. *Karpe, supra*.) Thus the statutory scheme permits and Glassford exercised each of his statutory rights. He was represented by counsel; he presented oral and documentary evidence; he cross-examined witnesses. Glassford received a fair hearing.

■ Of equal importance is that *Parklane's* legitimate concern that the defendant may "have little incentive to defend vigorously" is absent. Glassford was certainly motivated to participate in the administrative hearing. He wanted to protect his license—the source of his income.

It is also significant that in no way does our conclusion applying the doctrine of collateral estoppel interfere with the statutory scheme governing real estate licensees. The revocation of a professional licensee should not be viewed by either the professional organization or the licensee as an

insignificant proceeding treated in a cavalier fashion. As we have noted above the application of specified administrative procedures insulates the licensee from arbitrary action by the licensing entity. This statutory purpose is served when the licensee has further reason to vigorously contest an accusation which can result in financial liability beyond the scope of the hearing. Thus our holding has no detrimental affect on other public policy considerations that may in other situations work against application of the doctrine of collateral estoppel. (See e.g. *Standefer* v. *United States* (1980) 447 U.S. 10, 25 [64 L.Ed.2d 689, 701, 100 S.Ct. 1999]; Rest. 2d, Judgments, §§ 29, com. *b* and 83, subds. (3) and (4).)

We therefore hold that consistent with both California and United States Supreme Court precedent that on the facts of this case Glassford received a constitutionally fair hearing in the administrative proceeding permitting the trial court to later summarily adjudicate his fraud on the basis of the real estate commissioner's decision.

## II

■ Glassford asserts that notwithstanding the fairness of the earlier proceeding, a different issue was resolved in the administrative proceeding than was presented in his civil case. He says the Real Estate Commissioner's accusation did not charge him with whether the Imens reasonably relied upon any of his promises and accordingly the decision could not have decided that issue. Not only is this assertion contrary to the express finding made by the administrative law judge, but it is contrary to the uncontroverted declaration of Mehdi Imen.

The administrative law judge decided the identical questions which were raised by the Imens' complaint. The court was thus justified in summarily deciding those factual issues in a similar fashion. Glassford's conduct constituted fraud.

## III-V*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment is reversed to permit a limited retrial on the issue of compensatory damages consistent with this opinion. Following retrial the

---

*See footnote 1, *ante,* page 898.

amount of the judgment shall be reduced by $17,500 and shall not include attorneys' fees. In all other respects the judgment is affirmed. The defendant Harry Warner Glassford shall bear all costs for this appeal.

Todd, J., concurred.

BENKE, J., Dissenting—I respectfully disagree with that portion of the majority opinion applying the doctrine of collateral estoppel to this case. I do not believe precedent supports the position or analysis advanced by the majority, but, quite to the contrary, requires a reversal of the decision below.

Underlying the majority's application of collateral estoppel is its conclusion *People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321], mandates the use of the doctrine where the administrative agency involved has "acted in a judicial capacity." The court in *Sims,* however, effectively qualified this conclusion by also observing the statutory scheme involved there governing prosecutions for aid to families with dependent children (AFDC) fraud and the circumstances of individuals who receive welfare benefits made application of collateral estoppel particularly appropriate. (*Id.* at p. 489.) Thus I am not convinced *Sims* can be limited in the manner set forth by the majority. As was recently stated in *Mahon* v. *Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616 [245 Cal.Rptr. 103], such a limited interpretation of *Sims* ignores both the caveats and complexities of that case and the use of the doctrine at common law.

The doctrine of collateral estoppel, upon which the Imens rely, is "not an inflexible, universally applicable principle; policy considerations may limit its use where the limitation on relitigation underpinnings of the doctrine are outweighed by other factors." (*Jackson* v. *City of Sacramento* (1981) 117 Cal.App.3d 596, 603 [172 Cal.Rptr. 826]; *Kelly* v. *Trans Globe Travel Bureau, Inc.* (1976) 60 Cal.App.3d 195, 202 [131 Cal.Rptr. 488].) As the court in *Kelly* explained in a somewhat analogous situation: "Collateral estoppel is by no means an unmixed blessing where it is potentially applicable to bind a party to a proceeding in future litigation with nonparties. Then the possibility of collateral estoppel changes the economic balance of litigation by creating a controversy in which the potential of loss to one party is much greater than the possible gain to the other. A defendant fearing the collateral consequences of the result of litigation in future proceedings with others may be forced to spend in defense sums all out of proportion to the amount in immediate question. He is required to take procedural steps at trial and on appellate review that otherwise would not be taken because of the economics involved. Inevitably, the adversary system requires that the plaintiff meet those actions and take his own to counter them. In the end, the

collateral estoppel possibility can, and sometimes does, result in expense of litigation that threatens to exhaust the amount in immediate controversy."

This flexibility was echoed in *Parklane Hosiery Co., Inc.* v. *Shore* (1979) 439 U.S. 322, 329-330 [58 L.Ed.2d 552, 99 S.Ct. 645]: "The present case . . . involves offensive use of collateral estoppel—a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff. In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action. Nevertheless, several reasons have been advanced why the two situations should be treated differently.

"First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.' [Citation.] Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. [Citations.] Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

"A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. [Citations.] Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.

". . . . . . . . . . . . . . . . .

"We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. *The general rule should be that in cases where a plaintiff*

*could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.*" (Italics added; fns. omitted.) Nothing in *Sims* suggests the concerns of *Parklane* are not valid concerns or are improper considerations here. While mentioning *Parklane,* the majority in effect ignores it, damning its concerns with faint praise.

In this case the disciplinary proceeding the Imens rely upon was designed to determine Glassford's fitness as a licensee rather than the monetary damage suffered by any individual. Thus, in addition to evidence of misrepresentations made to the Imens, at the administrative hearing the judge considered evidence that Glassford wrongfully deprived his employer of a commission in an entirely unrelated transaction. In the Imens' suit for damages, evidence of Glassford's conduct in the second transaction would likely be barred under Evidence Code sections 786, 787 and 1101, subdivision (a). (See *People* v. *Martin* (1983) 150 Cal.App.3d 148, 160 [197 Cal.Rptr. 655].) In a case such as this, which turns upon the credibility of the defendant, such a procedural difference is material. In attempting to establish his credibility in the disciplinary proceeding, Glassford faced a prior "bad act" which would not confront him in the Imens' lawsuit. Fairness suggests that Glassford be given the opportunity to convince a trier of fact of his version of the *Imens'* transaction unfettered by evidence of collateral wrongdoing.

In addition to eliminating the evidentiary protection Glassford enjoys in a civil lawsuit, the potential detriment to the administrative process involved here cannot be ignored. In cases such as this where a licensee is facing multiple unrelated charges, one of which carries potentially large civil liability, application of collateral estoppel would make it imperative the licensee vigorously contest all charges. If he does not, he runs the risk a finding on any one of the charges will adversely impact the charge which involves the civil liability. The potential for settlement is obviously lessened. Such an incentive to litigation in the context of licensing regulation is not consistent with the doctrine of collateral estoppel or with an administrative procedure designed to both protect the public from unscrupulous and incompetent licensees, and at the same time protect the licensee from arbitrary action. Indeed, the majority turns such policies on their head. Its conclusion a licensee is somehow *more* insulated from arbitrary action because the administrative hearing has suddenly become a trial on financial liability issues which are far beyond the scope of the hearing, is a nonsequitur of significant proportions. It is not an assurance of fairness. Such a process is an open invitation to abuse and perversion of the administrative hearing processes in this state.

In addition, contrary to the holding of the majority, public policy does not encourage litigants to vigorously contest their rights in any forum.

" ' ". . . "[I]t is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court." (*Hamilton* v. *Oakland School Dist.,* 219 Cal. 322, 329 [26 P.2d 296]; see also *Central Basin etc. Wat. Dist.* v. *Fossette,* 235 Cal.App.2d 689, 705 [45 Cal.Rptr. 651].) Settlement agreements " 'are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation.' " *(McClure* v. *McClure,* 100 Cal. 339, 343 [34 P. 822]; see also *Estate of Johanson,* 62 Cal.App.2d 41, 56 [144 P.2d 72].). . . ." [Citations.]' " *(Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 441 [163 Cal.Rptr. 47].)[1] This policy applies no less in administrative proceedings than in our courts. As the court in *Kirby* v. *Alcoholic Bev. etc. Appeals Bd.* (1971) 17 Cal.App.3d 255, 260 [94 Cal.Rptr. 514], stated: "Even in cases strictly criminal, there is a public policy in favor of negotiations for compromise (*People* v. *West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409]); a fortiori there is an equal policy in cases such as this. The department, acting on the basis of written reports, secures a prompt determination, at little administrative cost; the licensee avoids the risks that testimony at a formal hearing may paint him in a worse light than the reports and, also, avoids the costs and delay of a hearing."

In this case considerations of fairness and administrative procedure outweigh the efficiency offered by application of collateral estoppel. I do not believe application of the doctrine is appropriate.

A petition for a rehearing was denied June 15, 1988, and appellant's petition for review by the Supreme Court was denied August 17, 1988. Panelli, J., was of the opinion that the petition should be granted.

---

[1] The repeated internal quotations as indicated by the quoted material is evidence of the frequency with which its principle has been cited.