119 T.C. No. 3


UNITED STATES TAX COURT


THOMAS E. JOHNSTON AND THOMAS E. JOHNSTON, SUCCESSOR IN INTEREST
TO SHIRLEY L. JOHNSTON, DECEASED, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 26005-96, 2266-97,    Filed August 8, 2002.
          12736-97.


        <u>Held</u>:  In this case involving a question of
Federal taxes, respondent's motion in limine to deny
petitioners' entitlement to assert the attorney-client
privilege, granted based on the Federal common law
doctrine of implied waiver.

        <u>Held</u>, <u>further</u>, respondent's motion for partial
summary judgment, requesting collateral estoppel based
on State court proceedings, denied.


<u>Lorraine G. Howell</u>, for petitioners.

<u>Louis B. Jack</u>, for respondent.

_____

        [1] Cases of the following petitioners are consolidated
herewith:  Thomas E. Johnston, docket No. 2266-97; and Eric T.
Johnston, docket No. 12736-97.

OPINION

NIMS, Judge:  Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes:

|  |  |  | Penalties | |
| Petitioner | Year | Deficiency | Sec. 6662(a) | Sec. 6663 |
| Thomas E. Johnston and * * * Shirley L. Johnston, Deceased | 1989 | $1,546,160 | $309,232 | $1,159,620 |
| Docket No. 26005-96 |  |  |  |  |
| Thomas E. Johnston | 1991 | 289,396 | -- | 217,047 |
| Docket No. 2266-97 |  |  |  |  |
|  | 1992 | 341,908 | -- | 256,431 |
| Eric T. Johnston | 1989 | 165,067 | 33,013 | -- |
| Docket No. 12736-97 |  |  |  |  |

By answer respondent also asserted increased deficiencies and penalties in docket Nos. 26005-96 and 2266-97.

These consolidated cases are presently before the Court on two motions filed by respondent.  Respondent filed a motion for partial summary judgment with respect to docket Nos. 26005-96 and 2266-97 and a motion in limine with respect to docket Nos. 26005-96, 2266-97, and 12736-97.  A hearing was subsequently held, and these motions were taken under advisement.  Pursuant to orders of

the Court, petitioners thereafter filed an opposition to each of respondent's motions, and respondent filed responses to petitioners' objections.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The information below is based upon examination of the pleadings, moving papers, responses, and attachments submitted in connection with these cases. Factual recitations are meant to provide context for our analysis of respondent's motions and endeavor to set forth matters that would appear not to be in dispute. They do not, however, constitute findings of fact for a subsequent trial.

## Estrella Properties, Ltd.

Prior to and during the years at issue, Thomas E. Johnston (Mr. Johnston) was involved in the real estate development business. As relevant herein, he conducted certain of his real estate activities through his wholly owned corporation, Sea-Aire Properties, Inc. (Sea-Aire). In the mid-1970s, Mr. Johnston, through Sea-Aire, became involved in Estrella Properties, Ltd. (Estrella), a California limited partnership. Estrella had been

established to develop a portion of the Forster Ranch[2] in San Clemente, California.  From June 30, 1978, through March 30, 1989, ownership of Estrella was distributed as follows:

| Partner Name | Interest Percentage | Interest Type |
| --- | --- | --- |
| Shannon Developers, Inc. | 10 Percent | General |
| Leo A. Fitzsimon | 5 Percent | General |
| Borg-Warner Equity Corp. | 79 Percent | Limited |
| Sea-Aire Properties, Inc. | 6 Percent | Limited |

Shannon Developers, Inc. (Shannon),[3] a corporation wholly owned by Darrel S. Spence, was also designated as the managing general partner.  Leo A. Fitzsimon received the ownership interest reflected above after having been employed for several years as a project manager and engineer for Estrella's development of the Forster Ranch.  Borg-Warner Equity Corp., or a subsidiary (without distinction Borg-Warner), had provided the funding used to finance the venture.

On March 30, 1989, the partners in Estrella entered a Partnership Settlement Agreement providing for disposition of assets owned by the entity.  This arrangement was apparently precipitated by dissatisfaction on the part of Borg-Warner with

---

[2] This property is variously referred to in filings submitted by the parties as both the Forster Ranch and the Forester Ranch.  For convenience we uniformly use the Forster terminology.

[3] It appears from documents submitted that Shannon Developers, Inc., may have been known as Shannon Development Co. in 1978 but had become Shannon Developers, Inc., by 1989.

the handling of partnership affairs.  Pursuant to the settlement agreement, the Forster Ranch property, with the exception of 22 lots referred to as the equestrian lots, was sold, and the proceeds were applied to reduce the unpaid balance on the funding provided through Borg-Warner.  Certain other properties were distributed to Shannon, Sea-Aire, and Mr. Fitzsimon in undivided interests of 47.62 percent, 28.57 percent, and 23.81 percent, respectively.  These properties included the equestrian lots and the stock of Shorecliffs Golf Course, Inc.[4] (Shorecliffs). Shorecliffs held title to a golf course of the same name which had previously been acquired by Estrella and the business of which was operated by Mr. Spence.

S.C. Equestrian Lots, Ltd.

Following the just-described settlement, the 22 equestrian lots were contributed to form S.C. Equestrian Lots, Ltd. (SCE), a California limited partnership.  Sea-Aire served as the general partner through at least July 1, 1992.  Thereafter, Uppaway Investments, Inc. (Uppaway), another entity related to Mr. Johnston, seems to have been substituted as general partner. Both Mr. Johnston and Mr. Fitzsimon were named as limited

---

[4] The various documents and filings submitted by the parties refer to this entity both as Shorecliffs Golf Course, Inc., and as Shorecliff Golf Course, Inc.  The plural form was selected by petitioners and respondent in their memoranda addressing the instant motions, and we for clarity adopt the plural throughout our discussion.

partners of SCE in partnership documents; Mr. Spence and/or Shannon were not. A promissory note and option agreement dated April 21, 1989, and executed by Mr. Johnston on behalf of Sea-Aire, would appear to reflect the sale of Shannon's undivided interest in the lots to Sea-Aire.

Sale of Shorecliffs Golf Course

By late 1988 and continuing through the middle of 1989, Mr. Spence was involved in negotiations for the sale of the golf course owned by Shorecliffs. In this connection, a real estate purchase option was entered for consideration of approximately $500,000 on December 23, 1988, by Mr. Spence on behalf of Shorecliffs as optionor and by Fon N. Leong and Agie J.C. Chen as optionees.

In addition to the above negotiations relating to the sale of the assets owned by Shorecliffs, discussions also ensued during this period among the Shorecliffs shareholders with regard to their respective interests in the entity. On May 11, 1989, a stock sale option agreement was signed by or on behalf of Shannon, Sea-Aire, and Mr. Fitzsimon. The option granted to Shannon the right to purchase the Shorecliffs stock owned by Sea-Aire and Mr. Fitzsimon. However, Mr. Spence and Mr. Johnston purportedly had an oral understanding that Sea-Aire could choose

to retain its interest in the company.  Shannon did in fact exercise its option to purchase the Shorecliffs stock owned by Mr. Fitzsimon.  Sea-Aire, on the other hand, retained its interest in Shorecliffs.

On June 28, 1989, Mr. Spence and Mr. Johnston met with attorney Thomas J. O'Keefe to discuss matters relating to the pending sale of the Shorecliffs golf course.  After certain extensions and modifications of the terms contemplated by the December 23, 1988, option agreement, a sale of the golf course ultimately closed on June 30, 1989.  The buyers were L.H.C. Investments, Fon N. Leong, and Ruth Li Shu Leong.  The total purchase price of between $5 and $6 million was paid in part by a $3 million promissory note secured by deed of trust.

State Court Litigation

The foregoing transactions eventually resulted in two suits filed by Mr. Fitzsimon in the Superior Court of the State of California, County of Orange.  The first, Fitzsimon v. S.C. Equestrian Lots, Ltd., No. 704870 (Cal. Super. Ct. June 9, 1995), was brought in February of 1993 against, among others, SCE, Mr. Johnston, Sea-Aire, Uppaway, Eric Johnston, Mr. Spence, Shannon, and Shorecliffs.  The complaint set forth 15 causes of action based on grounds such as fraud, intentional misrepresentation, breach of contract, breach of fiduciary duty, negligence, and conversion.  As most relevant for purposes of the motions now at

bar, the complaint alleged: (1) That Mr. Johnston and Mr. Spence fraudulently induced Mr. Fitzsimon to relinquish his interest in Shorecliffs shortly before the multimillion-dollar sale, and (2) that Mr. Fitzsimon was deprived of profits from the SCE venture on account of self-dealing transactions and diversion of proceeds by other partners. Requested relief included damages, imposition of constructive trust, declaratory relief, injunctive relief, dissolution of partnership, and accounting.

Following waiver by the parties of a jury, a bench trial began in late June of 1994. The Johnstons and their related entities were represented by counsel. The Superior Court thereafter rendered its findings in a special verdict form executed on October 6, 1994. Among other things, the court found that Mr. Spence, Shannon, Mr. Johnston, and Sea-Aire intentionally defrauded Mr. Fitzsimon in connection with sale of the Shorecliffs golf course. The special verdict also included a finding that Mr. Spence was an alter ego of Shannon and that Mr. Johnston was an alter ego of Sea-Aire and Uppaway. As regards the equestrian lots dispute, it was stipulated that SCE should be dissolved and a final accounting conducted.

An accounting referee was appointed by the court to provide recommendations on the accounting matters. After extensive comment from the parties, the court on June 9, 1995, entered its judgment addressing both the Shorecliffs and the SCE

transactions.  Mr. Fitzsimon was awarded compensatory damages against Mr. Spence, Mr. Johnston, and their related entities, as well as punitive damages against Mr. Spence and Shannon.  A constructive trust was imposed on the $3 million note secured by deed of trust.  The ruling with respect to alter ego status was also explicitly reiterated.

The judgment was appealed by Mr. Johnston and his related entities to the Court of Appeal of the State of California, Fourth Appellate District, Division Three.  Fitzsimon v. S.C. Equestrian Lots, Ltd., No. G018290 (Cal. Ct. App. May 25, 1999).  The appellate court affirmed in an unpublished opinion filed on May 25, 1999, and the decision became final with issuance of a remittitur by the Court of Appeal on July 29, 1999.

The second suit brought by Mr. Fitzsimon, Fitzsimon v. Good, Wildman, Hegness & Walley, No. 733226 (Cal. Super. Ct.[5]), was an action against Mr. O'Keefe and his firm for professional malpractice, fraud, and spoliation of evidence.  Before trial the defendants brought several motions in limine to exclude documents and testimony, including notes made by Mr. O'Keefe at the June 28, 1989, meeting.  The trial court ruled that the materials were protected by the attorney-client privilege, on grounds that (1)

---

[5] The materials submitted by the parties do not divulge any specific dates of relevant action by the Superior Court in this case.  It seems likely, however, that the suit would have been filed, and the nonsuit judgment entered (see infra text), in 1999.

the privilege was not waived by deposition or trial testimony in the earlier case, and (2) the crime-fraud exception was inapplicable. After these rulings, the parties stipulated to a nonsuit judgment in order to permit appeal. The appellate court, in an unpublished opinion filed on August 24, 1999, affirmed. Fitzsimon v. Good, Wildman, Hegness & Walley, No. G020125 (Cal. Ct. App. Aug. 24, 1999).

## Discussion

### I. Motion in Limine

Respondent's motion in limine asks the Court to enter an order in advance of trial ruling that "petitioner Thomas E. Johnston is not entitled to assert attorney-client privilege to prevent his former attorney, Thomas O'Keefe, from testifying about or producing records pertaining to certain confidential communications made by petitioner during the course of the representation". Framed more narrowly, respondent's request is principally concerned with notes made by Mr. O'Keefe regarding the June 28, 1989, meeting with Mr. Johnston and Mr. Spence. Respondent alleges that these notes are not protected by the attorney-client privilege on three alternative grounds: (1) Waiver by petitioners' having placed the nature of attorney-client communications at issue through claimed reliance on counsel's advice; (2) waiver by Mr. O'Keefe's having testified about privileged matters, during proceedings in Superior Court,

prior to claiming the privilege; and (3) the crime-fraud exception, applicable due to participation by Mr. O'Keefe in Mr. Johnston's scheme to defraud Mr. Fitzsimon of his interest in the Shorecliffs golf course.

### A. Applicable Law

As a threshold matter, we address the question of governing law.  In general, section 7453 and Rule 143(a) provide that Tax Court proceedings are to be conducted in accordance with the rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia. Consistent with this directive, we observe the Federal Rules of Evidence.  Rule 501 of the Federal Rules of Evidence controls issues of privilege and specifies as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

The foregoing rule establishes a structure where "Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law." Clarke v. Am. Commerce Natl. Bank, 974 F.2d 127, 129 (9th Cir.

1992); see also <u>United States v. Zolin</u>, 491 U.S. 554, 562 (1989); <u>United States v. Mass. Inst. of Tech.</u>, 129 F.3d 681, 684 (1st Cir. 1997); <u>United States v. Blackman</u>, 72 F.3d 1418, 1423-1424 (9th Cir. 1995); <u>Gannet v. First Natl. State Bank</u>, 546 F.2d 1072, 1075-1076 (3d Cir. 1976).  Conversely, State attorney-client privilege rules apply where the underlying cause of action rests on State law.  <u>Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.</u>, 32 F.3d 851, 861-862 (3d Cir. 1994).

Petitioners argue that the cases at bar involve the latter situation.  Petitioners claim:

> The issue here is not whether Petitioner has waived his attorney-client privilege in the within U.S. Tax Court proceeding involving federal statutes of the Internal Revenue Code.  The issue here is whether Petitioner waived his attorney-client privilege in <u>Fitzsimon v. S.C.Equestrian, et al</u>, a 1994 State Court proceeding involving causes of action under the laws of the State of California. * * *

We, however, disagree.  The matter before us is a redetermination of petitioners' Federal income tax liabilities under Title 26 of the United States Code.  It therefore falls squarely within the above-described parameters for an adjudication of Federal law.

Moreover, contrary to petitioners' suggestion, the issue here is precisely whether the privilege has been waived for purposes of this Tax Court proceeding, regardless of whether it was waived for purposes of earlier litigation in California.  Although certain of respondent's bases for contending that the

privilege is inapplicable here stem from conduct occurring before or considered by the State courts, this fact does not transform the Federal tax nature of, or inject any State law cause of action into, the present proceeding.  We also point out that one of the grounds relied upon in respondent's motion (wherein petitioners are alleged to have placed communications at issue by their litigation posture in this Court) deals exclusively with what has transpired before us.  We conclude that Federal common law governs.

B.  Analysis

As construed under Federal common law, the attorney-client privilege exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  The privilege applies to communications made in confidence both: (1) By a client to an attorney for the purpose of obtaining legal advice, and (2) by an attorney to a client where containing legal advice or revealing confidential information on which the client seeks advice.  Id. at 390; Bernardo v. Commissioner, 104 T.C. 677, 682 (1995); Hartz Mountain Indus. v. Commissioner, 93 T.C. 521, 525 (1989); Karme v. Commissioner, 73 T.C. 1163, 1183 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).  The burden of establishing that the attorney-client privilege is applicable to

particular communications or documents rests with the party asserting the privilege. <u>Clarke v. Am. Commerce Natl. Bank</u>, <u>supra</u> at 129; <u>Bernardo v. Commissioner</u>, <u>supra</u> at 682.

As previously indicated, one of the grounds on which respondent alleges that Mr. O'Keefe's notes are not protected here is that petitioners waived the privilege by claiming reliance on advice of counsel. This contention invokes the doctrine of what is referred to as implied waiver. <u>Ideal Elec. Sec. Co. v. Intl. Fid. Ins. Co.</u>, 129 F.3d 143, 151 (D.C. Cir. 1997); <u>Home Indem. Co. v. Lane Powell Moss & Miller</u>, 43 F.3d 1322, 1326 (9th Cir. 1995). While the precise reach of the theory can be a subject of some controversy, courts typically employ some version of one of several general approaches. See, e.g., <u>Frontier Ref., Inc. v. Gorman-Rupp Co.</u>, 136 F.3d 695, 699-700 (10th Cir. 1998) (cataloging various standards); <u>Zenith Radio Corp. v. United States</u>, 764 F.2d 1577, 1579 (Fed. Cir. 1985) (same). These include the so-called automatic waiver rule, under which a party automatically waives the privilege by asserting a claim or defense to which otherwise privileged matter is relevant, see <u>Indep. Prods. Corp. v. Loew's Inc.</u>, 22 F.R.D. 266, 276-277 (S.D.N.Y. 1958); a balancing test that weighs the need for discovery against the need to protect the secrecy of the communication, see <u>Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.</u>, 838 F.2d 13, 20-22 (1st Cir. 1988); the three-pronged

test of <u>Hearn v. Rhay</u>, 68 F.R.D. 574, 581 (E.D. Wash. 1975); and a purportedly more restrictive test where waiver is effected only if a litigant directly injects an attorney's advice into issue, see <u>Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.</u>, <u>supra</u> at 863-864.

On the facts of the instant cases, it would appear that the same result would obtain under any of the foregoing approaches. We observe, however, that the approach of <u>Hearn v. Rhay</u>, <u>supra</u>, has been both discussed with approval by the United States District Court for the District of Columbia, whose rules of evidence are applicable under section 7453, see <u>United States v. Exxon Corp.</u>, 94 F.R.D. 246, 248-249 (D.D.C. 1981), and explicitly adopted by the Court of Appeals for the Ninth Circuit, the venue for appeal in these cases, see <u>United States v. Amlani</u>, 169 F.3d 1189, 1195 (9th Cir. 1999).  This Court, too, has previously quoted <u>Hearn v. Rhay</u>, <u>supra</u>, with positive implication.  <u>Karme v. Commissioner</u>, <u>supra</u> at 1184.

<u>Hearn v. Rhay</u>, <u>supra</u> at 581, sets forth the following three factors which must be extant for a finding of implied waiver:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. * * *

To similar effect, this Court stated in <u>Bernardo v. Commissioner</u>, <u>supra</u> at 691 (fn. ref. omitted), that the taxpayers did not impliedly waive the privilege where they did not "affirmatively raise a claim that can only be effectively disproven through the discovery of attorney-client communications". Given this precedent and section 7453, we structure our discussion here within the three criteria of the foregoing test.

The statutory notices issued to Mr. Johnston determine deficiencies and section 6663 fraud penalties for each of the years 1989, 1991, and 1992. After petitions were filed in these cases, respondent submitted answers affirmatively setting forth the facts upon which respondent relied in support of the fraud determinations, as required by Rule 36(b) with respect to issues on which respondent bears the burden of proof. Mr. Johnston, in accordance with Rule 37(b), then followed with replies denying the majority of respondent's affirmative allegations. The replies also included additional material addressing affirmative defenses. The reply relating to Mr. Johnston's 1989 tax year stated:

> By way of Affirmative Defense to the matters affirmatively alleged by Respondent in its answer, Petitioners allege as follows:
>
>     *    *    *    *    *    *    *
>
> 12) In preparing Petitioner's returns for 1989, Petitioners relied upon advice of qualified experts for the underlying information developed and reported on Petitioner's income tax return for 1989.

A nearly identical reference to the "advice of qualified experts" was made in the reply dealing with the 1991 and 1992 tax years. It is on the above-quoted statement pertaining to 1989 that respondent bases contentions of implied waiver.

Petitioners' response to respondent's argument consists, in its entirety, of the paragraph reproduced below:

> Respondent argues, (p.7), that the Petitioner relied on Advice of Counsel in his defense of the within proceeding in his Reply referring to "qualified experts" assisting him in preparing his 1989 tax return. However, the Petitioner's reference in his Reply to "qualified experts" assisting him was his accountant who assisted him in the filing of his Form 1040X for the calendar year 1989 [1-R]. He does not refer to a lawyer. Therefore, there has been no defense of advice of counsel and Respondent's argument is misplaced.

It is within the just-described context that we turn to consideration of the three requirements for implied waiver. As previously indicated, the first mandates that the privilege be asserted as the result of some affirmative act. Here, Mr. Johnston asserted reliance on qualified experts as an affirmative defense to respondent's fraud penalty allegations.

In Hearn v. Rhay, supra at 576-577, the plaintiff brought suit claiming that his civil rights were violated during his incarceration in a State penitentiary. The defendants asserted the affirmative defense of qualified immunity based upon having acted in good faith, and the plaintiff sought discovery of legal advice the defendants received with respect to his confinement.

Id. at 577-578.  In those circumstances, the court held that asserting the privilege in furtherance of an affirmative defense satisfied the first element for qualified waiver.  Id. at 581. Other courts have similarly opined that raising affirmative defenses can result in a waiver of the attorney-client privilege. The United States District Court for the District of Columbia, for instance, has refused to uphold the privilege where the defense "of good faith reliance was affirmatively pleaded by the party seeking to use the attorney-client privilege as a shield against discovery."  United States v. Exxon Corp., supra at 248. Accordingly, the first requisite is met here if Mr. Johnston's reference to qualified experts is deemed to encompass legal counsel.

We conclude that to now narrow "advice of qualified experts" solely to assistance received from the accountant aiding Mr. Johnston in preparing his amended return would be to support a belated characterization belied by the record.  We initially note that Mr. Johnston's reply for the 1989 tax year was filed on September 22, 1997.  Petitioners' opposition to the motions in limine was filed on May 31, 2001, more than three and one-half years later.  In addition, the incongruity between the original plural "experts" and the subsequent singular "accountant" is difficult to reconcile.

Moreover, petitioners elsewhere in the opposition state:
"Thomas O'Keefe, Esq., a certified tax specialist, represented
the Petitioner as tax counsel rendering tax advice over a period
of many years, and in particular in 1989, the period during which
events occurred that are raised in Respondent's Motion in Limine
herein."  To similar effect, petitioners remark that "Thomas
O'Keefe, Esq., a certified tax specialist, had been a long time
attorney for Mr. Johnston and entities owned and controlled by
him", and at yet another location characterize Mr. O'Keefe as
"long time tax counsel of Petitioner, Mr. Johnston".
Additionally, the bill from Mr. O'Keefe to Shorecliffs and Mr.
Johnston for legal fees incurred in June of 1989 contains the
following description dated "06/28/89":

> Meeting with Tom Johnston, Darrell Spence and Frank
> Nish re Shorecliffs; Review of sale transaction;
> Prepared demand on escrow and notice and
> acknowledgement [sic] regarding earth subsidence issues
> to Buyer; Tax research and strategy planning regarding
> basis, installment deal, sub-s and Exchange issues.

There is also the fact that income from the Shorecliffs sale
was reported on neither the original nor the amended 1989 return.
Hence, to the extent that reliance on expert advice can excuse
the alleged fraudulent failure to report this transaction, such
reliance was not only or in the first instance on the accountant
aiding in preparation of the amended return.  We are satisfied

that petitioners' affirmative defense contemplated more than just the cited accountant and is appropriately read to include Mr. O'Keefe, who concededly provided tax advice in 1989.

The second requirement asks whether through this affirmative act the asserting party puts the protected information at issue by making it relevant to the case. This element, too, has been satisfied here. As the Court of Appeals for the Ninth Circuit explained in an analogous context: "to the extent that * * * [the defendant] claims that its tax position is reasonable because it was based on advice of counsel, * * * [the defendant] puts at issue the tax advice it received." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1162-1163 (9th Cir. 1992).

Likewise, petitioners seek to defend against the fraud allegations on grounds of reliance on experts. That defense places at issue the tax advice Mr. Johnston received with respect to his 1989 return. Petitioners have also admitted that Mr. O'Keefe rendered tax advice to Mr. Johnston during 1989. In addition, the California appellate court's unpublished opinion in Fitzsimon v. Good, Wildman, Hegness & Walley, No. G020125, slip op. at 6 (Cal. Ct. App. Aug. 24, 1999), contains the following statement: "Our review of the exhibits demonstrates there is substantial evidence for the trial court to have concluded defendants were hired by plaintiff's partners and to obtain tax advice and to research tax liability issues concerning a real

estate sale." Given these circumstances, petitioners, by raising the affirmative defense of reliance, must be said to have placed at issue in the present proceeding all tax advice received with respect to the 1989 transactions in dispute, including communications with Mr. O'Keefe.

Finally, the third inquiry is directed toward whether allowing the privilege would deny the opposing party access to information vital to its defense. The Courts of Appeals have cautioned that privileged communications do not become discoverable where they simply are relevant to issues raised in the litigation or where they are only one of several forms of indirect evidence about an issue. United States v. Amlani, 169 F.3d at 1195; Frontier Ref., Inc. v. Gorman-Rupp Co., 136 F.3d at 701-702; Zenith Radio Corp. v. United States, 764 F.2d at 1580-1581. Rather, the information must be "vital", Hearn v. Rhay, 68 F.R.D. at 581, such that it would be "manifestly unfair" to deny access due to consequent prejudice to the opposing party's defense, Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d at 1326-1327. Stated otherwise, the attorney-client privilege "may not be used both as a sword and a shield." Chevron Corp. v. Pennzoil Co., supra at 1162.

In connection with the affirmative defense posture presented in Hearn v. Rhay, supra at 581, the court explained that "one result of asserting the privilege has been to deprive plaintiff

of information necessary to 'defend' against defendants' affirmative defense, for the protected information is also germane to plaintiff's burden of proving malice or unreasonable disregard of his clearly established constitutional rights."  The analogous scenario in <u>United States v. Exxon Corp.</u>, 94 F.R.D. at 249, led the court to observe as follows:

> Exxon's affirmative defenses necessarily revolve around whether Exxon did, in fact, primarily or solely rely upon a particular DOE regulation or communication when the company made its pricing decisions.  Thus, the only way to assess the validity of Exxon's affirmative defenses, voluntarily injected into this dispute, is to investigate attorney-client communications where Exxon's interpretation of various DOE policies and directives was established and where Exxon expressed its intentions regarding compliance with those policies and directives. * * *

A parallel situation exists here.

Under section 7454(a) and Rule 142(b), respondent bears the burden of establishing fraud by clear and convincing evidence. Petitioners have asserted reliance on professionals as an affirmative defense to the fraud allegations.  To "defend" against this defense, respondent must show that such reliance either was unreasonable or did not in fact occur.  Respondent can do so only through knowledge of what tax advice Mr. Johnston received, and such would include communications from Mr. O'Keefe. Additionally, having invoked reliance on "experts", petitioners cannot now be entitled selectively to withhold communications from particular experts, especially those who petitioners concede

provided tax advice, while allowing communications from others to be disclosed.  Rebuttal of the affirmative defense will depend on the sum of tax advice received on the disputed transactions; respondent will be prejudiced if only portions (presumably those not detrimental to petitioners' position) are available.

To rephrase a conclusion of the Court of Appeals for the Ninth Circuit, petitioners "cannot invoke the attorney-client privilege to deny * * * [respondent] access to the very information that * * * [respondent] must refute in order to demonstrate" the unreasonableness or nonexistence of the claimed reliance.  Chevron Corp. v. Pennzoil Co., supra at 1163.  Doing so would engender precisely the sort of unfairness that the implied waiver doctrine was devised to avoid.

We therefore hold that all three elements of the Hearn v. Rhay, supra, test for implied waiver have been established.  We shall grant respondent's motion in limine on this basis.  Furthermore, since we reach our ruling based solely on petitioners' posture and defenses before this Court, we need not consider the potential impact of the State court decision in Fitzsimon v. Good, Wildman, Hegness & Walley, supra, which addressed only respondent's alternative grounds of waiver by disclosure and the crime-fraud exception.

## II.  Motion for Partial Summary Judgment

Respondent's motion for partial summary judgment asks that petitioners be collaterally estopped from relitigating the following 10 issues allegedly determined in Fitzsimon v. S.C. Equestrian Lots, Ltd., No.704870 (Cal. Super. Ct. June 9, 1995):

(1) Mr. Johnston intentionally defrauded Mr. Fitzsimon of his interest in the Shorecliffs golf course;

(2) Mr. Spence and Mr. Johnston sold the Shorecliffs golf course to a third party for $6 million;

(3) Mr. Spence and Mr. Johnston kept the proceeds from the sale;

(4) Mr. Spence's and Mr. Johnston's combined basis in the Shorecliffs golf course did not exceed $800,000;

(5) Mr. Fitzsimon's 23.81-percent share of the cash generated by the Shorecliffs sale, after adjustments for certain amounts actually paid to Mr. Fitzsimon pursuant to the fraudulent stock option sale agreement, was $478,998.55;

(6) during the year 1991, Mr. Spence had no interest in the SCE partnership;

(7) Sea-Aire and Uppaway are alter egos of Mr. Johnston;

(8) during the year 1991, Mr. Johnston's total partnership interest in the SCE partnership was 76.19 percent, consisting of

a 71.19-percent interest in his name and a 5-percent interest in the name of Uppaway that was attributable to Mr. Johnston personally;

(9) during the year 1991, Mr. Johnston's distributable share of SCE partnership net income was $1,141,417, consisting of $1,066,511 for his 71.19-percent personal interest and $74,906 for the 5-percent interest of Sea-Aire/Uppaway; and

(10) Mr. Johnston's distributive share of SCE's net loss for 1992 was $2,362.

Petitioners dispute each of the foregoing points.

A. Standard for Summary Judgment

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." Rule 121(b) directs that a decision on such a motion shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1578 (1987). Facts are viewed in the light most favorable to the nonmoving party. Id. However, where a motion for summary

judgment has been properly made and supported by the moving party, the opposing party may not rest upon mere allegations or denials contained in that party's pleadings but must by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial.  Rule 121(d).

B.  Standard for Collateral Estoppel

Collateral estoppel exists for "the dual purpose of protecting litigants from the burden of relitigating an identical issue and of promoting judicial economy by preventing unnecessary or redundant litigation."  Meier v. Commissioner, 91 T.C. 273, 282 (1988); see also Montana v. United States, 440 U.S. 147, 153-154 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).  In general, the doctrine of collateral estoppel, also referred to as issue preclusion, forecloses relitigation of issues actually litigated and necessarily decided in a prior suit.  Parklane Hosiery Co. v. Shore, supra at 326 n.5; Meier v. Commissioner, supra at 282; Peck v. Commissioner, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525 (9th Cir. 1990).

This Court, expanding upon three factors identified by the Supreme Court in Montana v. United States, supra at 155, has set forth five prerequisites necessary for the application in factual contexts of collateral estoppel:

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.
> (2) There must be a final judgment rendered by a court of competent jurisdiction.

(3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.
(4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.
(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. [Peck v. Commissioner, supra at 166-167; citations omitted.]

Additionally, where collateral estoppel premised on a State court proceeding is sought to be used offensively in Federal court, reference is made to the controlling State law to determine the propriety of such offensive use. Bertoli v. Commissioner, 103 T.C. 501, 508 (1994). California courts have sanctioned use of offensive collateral estoppel. See Imen v. Glassford, 247 Cal. Rptr. 514, 518-519 (Cal. 1988); Estate of Gump v. Gump, 2 Cal. Rptr. 2d 269, 286 (Cal. Ct. App. 1991).

C. Analysis

Having considered the state of the record in these cases, the points as to which respondent would have us apply collateral estoppel, and the matters which could remain for trial, we conclude that the purposes of the doctrine would not be served at this juncture by resort to issue preclusion. On a fundamental level, as previously discussed, collateral estoppel exists to prevent unnecessary and redundant litigation. Yet given the particular facts under review, we see little to be gained when measured against this standard.

The facts pertaining to the Shorecliffs transaction are closely intertwined with each other, as are those relating to the SCE partnership. Consequently, to the extent that any of the related matters must be litigated, much of the evidence and argument will of necessity go to the relevant transactions as a whole. Because we are satisfied after review of the record that at least a majority of the above-enumerated points lacks the requisite basis for issue preclusion, it becomes apparent that significant redundancy is unavoidable.

Furthermore, cognizant of the rather unconventional nature of the California trial court's disposition (in the form only of a special verdict and judgment) and the otherwise troublesome state of the record in these cases, we cannot take lightly the principle that "issue preclusion must be applied carefully so that fairness to litigants is not compromised for efficiency and economy." Monahan v. Commissioner, 109 T.C. 235, 242 (1997); see also United States v. Silliman, 167 F.2d 607, 614 (3d Cir. 1948) ("Such a rule of public policy [collateral estoppel] must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair day in court.").

Hence, absent a clearer picture of what transpired in State court and in light of the interdependence of many pertinent

matters, we believe that the issues in these cases are more appropriately dealt with in a unified manner.  We thus will deny respondent's motion for partial summary judgment.

To reflect the foregoing,

Appropriate orders will be issued granting respondent's motion in limine in all docket Nos. and denying respondent's motion for partial summary judgment in docket Nos. 26005-96 and 2266-97.