**GREATER NEWBURYPORT
CLAMSHELL ALLIANCE,
et al., Plaintiffs,**

v.

**PUBLIC SERVICE COMPANY OF
NEW HAMPSHIRE, et al.,
Defendants, Appellees,**

**Appeal of Jan SCHLICHTMANN.**

**No. 87–1037.**

United States Court of Appeals,
First Circuit.

Heard July 30, 1987.

Decided Jan. 29, 1988.

Nancy Gertner with whom Judith H. Mizner, Silverglate, Gertner, Fine, Good & Mizner, John Reinstein, Civ. Liberties Union of Massachusetts, Jan Schlichtmann, Schlichtmann, Conway & Crowley, Boston, Mass., Robert Stein and Shaheen, Cappiello, Stein & Gordon, Concord, N.H., were on joint brief, for appellant Jan Schlichtmann and plaintiffs Greater Newburyport Clamshell Alliance.

J. Kent Pearson, Jr., with whom Edward M. Kaplan and Sulloway Hollis & Soden, Concord, N.H., were on brief, for defendants, appellees Public Service Co. of New Hampshire and Donald Bazin.

Daniel Mullen with whom Stephen J. Judge and David S. Peck, Asst. Attys. Gen., and Stephen E. Merrill, Atty. Gen., Concord, N.H., were on brief, for defendants, appellees James Nims, William Dodge and Richard Campbell.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Schlichtmann appeals from an order of the district court holding him in contempt for refusing to answer defendants-appellees' discovery requests. The court had ruled that Schlichtmann, plaintiffs' counsel in this 42 U.S.C. § 1983 suit, could not invoke the attorney-client privilege in response to appellees' service of a notice of deposition upon written questions. This case presents the issue of the extent to which a client, by instituting a civil action, waives his attorney-client privilege over confidential communications relevant to the subject matter involved in the action. We hold that the waiver is limited and direct the district court to dismiss the contempt charges and to direct further discovery consistent with the principles discussed below.

## I. *Background*

### A. *The Complaint*

On January 11, 1983, plaintiff Greater Newburyport Clamshell Alliance ("Alliance"), and individual members of that unincorporated association opposed to the development and use of nuclear energy, filed a civil rights suit under sections 1983 and 1988 against defendants-appellees Public Service Company of New Hampshire ("PSCNH"), Donald Bazin, an employee of PSCNH, and certain officers of the New Hampshire State Police. The complaint alleged that defendants, through the use of an undercover informant, defendant James Nims, had violated plaintiffs' sixth amendment rights to effective assistance of counsel by obtaining privileged communications between plaintiffs and Schlichtmann concerning trial preparation and defense strategy, and that this information was transmitted to the state police and to Bazin, a prosecution witness in the state criminal trial. Plaintiffs sought compensatory and punitive damages and declaratory and injunctive relief.

The plaintiffs alleged the following: Alliance was opposed to the construction by PSCNH of a nuclear power plant in Seabrook, New Hampshire. On May 26, 1980, the plaintiffs were arrested during the course of a protest at PSCNH's headquarters and were charged in local court with criminal trespass. Following their arrests, the plaintiffs retained attorney Schlichtmann. Between June 3, 1980 and January 21, 1981, members of Alliance held various meetings with Schlichtmann to prepare their defense to the trespass charges.

Prior to March 1980, the defendants had allegedly conspired to assign undercover agent Nims to infiltrate Alliance. It is further alleged that, as a result, Nims attended the attorney-client meetings, overheard confidential information relative to trial strategy, and communicated to defendants Dodge and Bazin information which proved essential for identifying the protesters of May 26.

The critical sixth amendment claim was that defendant Bazin used the information provided by Nims to prepare testimony for the prosecution for the upcoming trial. Specifically, Bazin "gave testimony which purported to describe his observations . . . and in which he identified a number of persons, including some of the plaintiffs . . . as having been present [at the PSCNH headquarters on May 26]." On October 1, 1980, Alliance members—including Nims— were convicted, fined $100, and placed on probation for a period of one year. Under New Hampshire law, the appellants requested a trial *de novo* at the Superior Court. After the jury had been empaneled, the prosecution informed the defense that one of the defendants had been a state police informant. The state then entered a *nolle prosequi* dismissing the charges against all defendants.

### B. *Proceedings Below*

After the filing of this civil rights complaint, the state police defendants had the court issue, on October 16, 1984, a subpoena on appellant directing him to appear and to bring:

> Any and all pleadings, correspondence, investigation reports, memoranda, notes, time records, billing records, charts, diagrams, maps, photographs, tape recordings, video tapes, exhibits or any other documents or material you received, obtained, created or prepared in the course of representing the Defendants in a New Hampshire criminal case in the Manchester District Court and the Hillsborough County Superior Court entitled *State of New Hampshire v. Edgar M. Bottome, et al.*, Hillsborough County Superior Court No. 80–1692.

The plaintiffs moved to quash the subpoena on grounds that the privileged information was irrelevant to their sixth amendment claim, and that the client had not waived the attorney-client privilege by bringing a § 1983 suit. A magistrate recommended a denial of the motion reasoning that the sixth amendment right to counsel was not implicated in a civil case, and that the plaintiffs had subjected themselves to reasonable discovery by having filed the suit. Over the plaintiffs' objections, the court below adopted the magistrate's recommendations. The court's findings in the discovery order, unchallenged in this appeal, show that 1) the "strategy meetings" took place, 2) Nims was a state undercover agent who attended the meetings, 3) Nims overheard privileged communications, 4) Nims relayed information to Bazin who was the sole government witness for the prosecution at the criminal trespass trial, and 5) Bazin learned about the identity of certain plaintiffs from information supplied by Nims. The court, however, could not find at the pretrial stage that Nims had conveyed the information to the prosecutor.

The court ruled on August 1, 1985 that the plaintiffs had automatically waived their privilege by instituting this suit. Alternatively, the court held that disclosure was justified because the need for discovery to defend against the "substantial punitive damages sought" outweighed the need for secrecy, particularly because the sixth amendment was not directly implicated in a civil case. The court thus ordered that "[t]he defendants may depose Attorney Schlichtmann with reference to all conferences at which the undercover informant was present with respect to any matters discussed thereat."

On October 30, 1985, the appellant filed a petition for a writ of mandamus, which this court denied. Defendants PSCNH and Bazin then tried to secure testimony from the attorney on May 14, 1986 by serving a notice of deposition upon written questions under Fed.R.Civ.P. 31. The appellant answered some questions pertaining to the identity of his clients who were arrested in May 1980, and to the purpose of the meetings. He refused to answer, on the basis

of the attorney-client privilege, any questions that might disclose the contents of the conversations. He also refused to disclose notes, memoranda, or other communications regarding trial preparation and strategy. After holding a hearing, the court found Schlichtmann in contempt for disobeying the discovery order. The court then imposed a sanction of $100 per day, commencing on November 11, 1986, but stayed discovery and imposition of the fine pending appeal.

Appellant has abandoned the argument that the information sought is irrelevant under Fed.R.Civ.P. 26(b)(1). Instead, he claims, first, that the court improperly balanced the need for the information versus the intrusion into the attorney-client relationship caused by the disclosure; second, that the privilege is not automatically waived by filing a civil action; and third, that the broad discovery authorized by the court chills attorney-client confidences, stifles Section 1983 suits, and offends the sixth amendment.

## II. *Discussion*

■ The validity of the contempt order under Fed.R.Civ.P. 37(b)(2)(D) depends on the correctness of the underlying discovery order. *Hanley v. James McHugh Const. Co.*, 419 F.2d 955, 957 (7th Cir.1969). Since we have not been asked to consider the harshness of the sanction, we review only whether the court abused its discretion by finding a waiver of the attorney-client privilege. *See Cope v. McPherson*, 781 F.2d 207, 208 (D.C.Cir.1985) (per curiam); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1382 (D.C.Cir.1984).

■ Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." The common law's attorney-client privilege, recognized by the federal courts as an exception to discovery, can be waived either expressly or implicitly. *See In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir.1982).

We have encountered two general approaches to the resolution of the issue of whether a party implicitly waives privileged information by litigating his claims in a civil case. Courts have either found an automatic waiver of the privilege by raising the civil claim (the "automatic waiver rule") or have applied some form of a balancing test to determine whether the privilege is waived under the facts of the particular case.

The automatic waiver rule was presented in *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266, 276–78 (S.D.N. Y.1958). *See also Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586, 593–94 (D.Mass.1979); *Garfinkle v. Arcata Nat. Corp.*, 64 F.R.D. 688, 689 (S.D.N.Y.1974). In *Loew's*, the plaintiffs, motion picture producers and distributors, filed a private antitrust action against the defendants alleging a conspiracy to restrain the distribution of a certain film. The defendants sought to depose Lazarus, president and sole stockholder of one of the plaintiffs, to inquire into his alleged association with certain subversive organizations, and into his refusal to testify before a congressional committee. During the course of his examination, Lazarus invoked the first and fifth amendment privileges in refusing to answer such questions. After finding relevancy for purposes of pretrial discovery, the court ruled that Lazarus had waived his constitutional privileges by having his company file a civil suit. *Id.* at 276. The court reasoned:

... Plaintiffs in this civil action have initiated the action and forced defendants into court. If plaintiffs had not brought the action, they would not have been called on to testify. Even now, plaintiffs need not testify if they discontinue the action. They have freedom and reasonable choice of action. They cannot use this asserted privilege as both a sword and a shield. Defendants ought not be denied a possible defense because plaintiffs seek to invoke an alleged privilege.

*Id.* at 277.

In *Lyons v. Johnson*, 415 F.2d 540, 542 (9th Cir.1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970), the Ninth Circuit also suggested an automatic

waiver rule in resolving whether the plaintiff, by bringing a § 1983 action, had waived her fifth amendment privilege against self-incrimination. There, the plaintiff alleged that state officials had unconstitutionally placed her into a mental institution after she was found incompetent to stand trial on misdemeanor charges. During her deposition, the plaintiff refused to answer all questions related to her claim, except her name. The district court dismissed the suit, and the Ninth Circuit affirmed. The court held that the plaintiff had voluntarily waived her facially meritless constitutional privilege by instituting a federal civil rights action. As in *Loew's*, the court noted:

> Her obtaining of this shield [*i.e.,* the privilege], however could not provide a sword to her for achieving assertion of her claims against the defendants without having to conform to the processes necessary to orderly and equal forensic functioning. Clearly, the process of discovery has become increasingly recognized as one of the primary and essential elements in making federal court business flow and in contributing to the accomplishing of trial justice or settlement termination of litigation. The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim. If any prejudice is to come from such a situation, it must, as a matter of basic fairness in the purposes and concepts on which the right of litigation rests, be to the party asserting the claim and not to the one who has been subjected to its assertion. It is the former who has made the election to create an imbalance in the pans of the scales.

*Id.* at 542.

The Ninth Circuit, however, subsequently backed away from the broad language of *Lyons.* In *Campbell v. Gerrans,* 592 F.2d 1054 (9th Cir.1979), the court reaffirmed that the fifth amendment applies to civil as well as criminal charges and refused to find an automatic waiver of the privilege to not incriminate oneself in a civil proceeding. *Campbell* limited the holding in *Lyons* to the situation where it was unlikely that "the Fifth Amendment could properly be pled to all the questions [posed in interrogatories by the civil defendant], some of which were merely for background information." *Id.* at 1057.

The automatic waiver rule was implicitly rejected in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975), where that court required a showing of necessity before the attorney-client privilege could be pierced. Under the *Hearn* test, a court should order disclosure only where 1) the privileged party puts his confidences at issue through an affirmative act, such as the filing of a complaint or the raising of an affirmative defense, 2) the assertion of the privilege results in manifest injustice to the opposing party *and* 3) the information sought is "vital" or "necessary" to the defense. *See id.* at 581. The third prong of the *Hearn* approach constitutes a significant departure from *Loew's* and *Lyons* for it places the burden on the party seeking discovery to show that the information is relevant and material to his claims or defenses. *See id.* at 582; *see also* 4 *Moore's Federal Practice* ¶ 26.60[6] at 26–218, 219 (1986).

The Circuit Court for the District of Columbia placed an even greater burden on the defense when its scope of discovery may violate the plaintiffs' first amendment associational privilege. *Black Panther Party v. Smith,* 661 F.2d 1243 (D.C. Cir. 1981), *judgment vacated without opinion sub nom. Moore v. Black Panther Party,* 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982). While adopting a balancing approach, *see id.* at 1266, that court held that disclosure of information *vital* to defendants' case should be compelled "only after the litigant has shown that he has exhausted every reasonable source of information." *Id.* at 1268. Furthermore, the defendants "must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity." *Id.* The court indicated that the burden on the defendant was proportionate to the danger posed by the discovery to the

constitutional right. *Id.* at 1267. *Black Panther Party* justified such a heavy burden for disclosure in that case primarily because of the "preferred position of First Amendment rights" in civil cases. *Id.* at 1268.[1]

More recently, in *Zenith Radio Corp. v. United States,* 764 F.2d 1577 (Fed.Cir. 1985), the Federal Circuit rejected the automatic waiver rule and applied a balancing test to protect non-constitutional privileges. In that case, Zenith brought an action to enjoin the United States from settling certain claims against importers of Japanese electronic equipment. As part of the action, in which the lower court dismissed Zenith's claims for want of jurisdiction, the United States filed a motion claiming damages to cover lost interest because of wrongful delay caused by Zenith in the settlement of the claims. Zenith opposed the motion alleging, *inter alia,* that the government had failed to mitigate damages, for it could have sought to recover interest from the importers. Zenith had learned that government lawyers were in disagreement over whether the United States should have sought interest directly from the importers. Zenith then sought to discover from the government all documents and the substance of the privileged conversations "relating to the loss of interest issue." The United States alternatively invoked the attorney-client, work-product, and executive privileges. The lower court applied the *Hearn* rule and held that the government had waived these privileges with respect to most of the discovery requests.

In reversing the district court, the court of appeals rejected the automatic waiver rule and found no waiver under either *Hearn* or *Black Panther Party.* The court held that Zenith had not made a "sufficient showing" that the information was "vital" to the defense. 764 F.2d at 1580. Without deciding whether the information was relevant, the court found:

> The matters that Zenith seeks to probe by obtaining this information are the views of the various government officials participating in the discussions and conferences regarding the interest question, what was said at those conferences, the advice those officials gave and received, and the extent to which those officials explored the pertinent legal principles and precedents governing the accrual of interest. *These matters are tangential to and remote from the central legal issue in the case. To whatever extent they may be relevant to Zenith's defenses, their probative value is too weak to justify breaching the important privileges the government asserted in declining to produce the information.*

*Id.* at 1580–81 (emphasis supplied).

Similarly, the Eighth Circuit has rejected the automatic waiver rule in favor of a balancing approach to determine whether a party has waived a non-constitutional privilege. In *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982), that court held that a defendant-counterclaimant by asserting a fraudulent misrepresentation claim did not waive the attorney-client privilege as to all conversations, but only as to those that could be used to rebut the elements of his claim. *See also Mitchell v. Roma,* 265 F.2d 633, 637 (3d Cir.1959) (while "disclosure might be of some indirect, casual or remote benefit to the defendant ... such elusive benefit is not weighty enough to overcome the public policy against disclosure" of a government informant's privilege in a Fair Labor Standards Act case).

■ As in *Zenith* and *Sedco,* the privilege being invoked in this civil case is not constitutionally protected. The sixth amendment provides a shield for the attorney-client privilege only in criminal proceedings; upon the termination of those proceedings and initiation of a civil action putting the privilege at issue, that *constitutional* protection ends. The liberal federal policy favoring discovery is of substantially greater relative weight where the

---

1. It is of some interest to note, however, that the Supreme Court, without opinion, vacated the judgment in this case and ordered dismissal of the complaint with prejudice. *Moore v. Black Panther Party,* 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982).

plaintiff invokes the privilege in a civil rather than a criminal case. *Loew's*, 22 F.R.D. at 278. Particularly in a civil case, a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the defendant. 8 *Wigmore On Evidence*, § 2327 at 635–36 (McNaughton rev. 1961).

On the other hand, the attorney-client relationship which the government is attempting to invade through this discovery action is the very relationship which it allegedly violated while the privilege was still under cover of the constitution. We do not believe all sixth amendment concerns evaporate simply because the government declined further prosecution of the criminal case and the possibly aggrieved party now attempts to receive compensation for the alleged constitutional transgression.

■ These considerations suggest that the automatic waiver rule, in what may be termed a "quasi-constitutional" situation, is too harsh. Without any consideration of the relative interests involved, it simply destroys a privilege even if the privilege would not shield evidence of any significance to the defense. Instead, a court should begin its analysis with a presumption in favor of preserving the privilege. In a civil damages action, however, fairness requires that the privilege holder surrender the privilege to the extent that it will weaken, in a meaningful way, the defendant's ability to defend. That is, the privilege ends at the point where the defendant can show that the plaintiff's civil claim, and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails. The burden on the defendant is proportional to the importance of the privilege. The court should develop the parameters of its discovery order by carefully weighing the interests involved, balancing the importance of the privilege asserted against the defending party's need for the information to construct its most effective defense. In this case, of course, appellees' defense depends upon the elements of the constitu-tional claim of appellant's clients. We thus must identify these elements.

■ The right to effective assistance of counsel is infringed when a government informant attends a confidential attorney-client meeting and relays information about defense strategy to the prosecution for use against the defendant at trial. *See Weatherford v. Bursey*, 429 U.S. 545, 554, 97 S.Ct. 837, 843, 51 L.Ed.2d 30 (1977); *see also Cinelli v. City of Revere*, 820 F.2d 474, 476–78 (1st Cir.1987); *United States v. Dyer*, 821 F.2d 35, 37–38 (1st Cir.1987); *United States v. Mastroianni*, 749 F.2d 900, 905–08 (1st Cir.1984). The government may try to justify the intrusion by creating a "substantial record" of necessity either to protect the identity of the informant or to investigate plans for further criminal activity which may be revealed at the meetings. *Mastroianni*, 749 F.2d at 905–06. Once the criminal defendant makes out a *prima facie* case of prejudice, namely that strategy information was relayed to the prosecution, the burden shifts to the government to show want of prejudice. *Id.* The government can satisfy its heavy burden by demonstrating that the relayed information had nothing to do with the theory of the defense or with trial preparation or strategy, or that it had obtained the information prior to the meetings. *Id.* at 908.

■ Only information *communicated* to the prosecutor is capable of prejudicing a criminal defendant's sixth amendment rights at trial. Appellant reasons therefore that evidence of information not communicated by Nims is not vital to the government to show the absence of prejudice or otherwise to justify the intrusion. Since the government can find out from Nims himself whatever he told his superiors, appellant argues, the court should not sanction any further intrusion into the attorney-client relationship.

We disagree. The above review of the elements of appellees' claim and appellees' possible defenses suggests several considerations which weigh in favor of the defendants' interest in disclosure of what transpired at the meetings Nims attended.

First, since the state defendants apparently concede that Nims did indeed attend the Clamshell–Schlichtman defense meetings, an integral part of their defense will be to show that Nims' attendance at these meetings was *necessary* in the sense of serving some *legal* purpose, *i.e.*, over and above the illegal object of spying on the conversations of the accused members of Clamshell with their attorney in preparation for the defense of the pending criminal charges. Appellees may thus need to know what actually transpired at the meetings in order to establish why Nims could not suddenly cease to attend them and thereby possibly betray his true identity. They may also attempt to show that Nims' continued attendance was required to investigate further plans for additional illegal disruptions and trespasses.

Second, the state defendants will be interested in the factual basis for the plaintiffs' position that Nims was actually privy to confidential information at these meetings. Arguably all or much of what Nims knew was based on other sources or earlier meetings. If the record of the meetings does not support plaintiffs' case, the defendants will wish to use the record of the meetings to persuade the jury by way of negative inference that the alleged confidences did not actually take place when the plaintiffs say they did. This evidence would likely be more forceful than Nims' testimony. The evidence would also assist the other defendants in evaluating Nims' own credibility.

Third, knowledge of what actually transpired at these meetings is also relevant to proving a divergence between the defense strategy actually discussed and the substance of Nims' reports. The state may attempt to make this showing in order to prove that at least Nims' primary purpose in attending the meetings was not to sabotage the defense, a showing that may be relevant to escape punitive damages.

Finally, it must be emphasized that the civil defendants' burden of showing lack of prejudice is a heavy one. *Mastroianni*, 749 F.2d at 905–06. The defendants, therefore, may have a strong need for even redundant evidence since "[t]he state must create a substantial record to justify intrusion into this otherwise constitutionally protected domain." *Id.*

Two other considerations weigh in favor of disclosure. First, the criminal trial ended with an entry of *nolle prosequi*, and the statute of limitations now apparently bars PSCNH from suing plaintiffs civilly. Hence, revealing appellants' attorney-client conversations now will no longer increase the risk of criminal or civil liability. Secondly, plaintiffs are not being *compelled* to forego their privilege. Having control of their lawsuit, they can always drop the case if disclosure of the privileged information is too high a price to pay. Alternatively, perhaps, they could amend their complaint to lessen the defendants' need for the privileged information (*e.g.*, eliminate the claim for punitive damages).

On the other side of the scales, we note first that, while the plaintiffs are not being compelled to bring the present litigation, neither are they solely responsible for it. It was, after all, the government which admittedly sent an informer to invade confidential meetings between appellant and his clients. Plaintiffs are a "voluntary" party "only because there is no other means of protecting legal rights.... '[C]ivil plaintiffs seldom voluntarily seek situations requiring litigation.'" *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1089 (5th Cir.1979) (citation omitted).

Secondly, utmost candor between an attorney and client is essential to effective assistance of counsel. "[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel." *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir.1973). *See also Glasser v. United States*, 315 U.S. 60, 62, 62 S.Ct. 457, 461, 86 L.Ed. 680 (1942). The free exchange of information between attorney and client could be inhibited by requiring a criminal defendant, in effect, to waive subsequent enforcement of personal rights due to the content of communications during the criminal action.

Finally, by enacting 42 U.S.C. § 1983, Congress concluded that private enforcement of individual rights is in the public interest. This important public policy will not be advanced by presenting a party with the Hobson's choice of either dropping its claim or revealing all confidential communications related to a criminal defense. The scope of required disclosure should not be so broad as to effectively eliminate any incentive to vindicate the constitutional right through a section 1983 suit.

■ These considerations lead us to a narrow reading of the district court's order of August 1, 1985 which stated, "The defendants may depose Attorney Schlichtmann with reference to all conferences at which the undercover informant was present with respect to any matters discussed thereat." Regarding any otherwise confidential communications, we understand this to be a requirement that appellant reveal only that which was actually discussed at the meetings Nims attended. As the above discussion of defendants' interest in disclosure indicates, this is the only information for which defendants have so far shown a true need and without which they may be unfairly prejudiced in their defense. On the other hand, revealing this information will be a minimal additional intrusion into the attorney-client privilege since defendants should already have access to the contents of those communications from their informant. On the record before us, this is as far as the balance tips in favor of defendants. We perceive insufficient justification for requiring appellant to disclose any communications or trial preparation other than the explicit discussions which occurred during meetings at which Nims was present, or

notes, memoranda, or other material reflecting the same. Specifically, appellant should not be held in contempt for failure to answer questions 16 through 23 and 30 of defendants' deposition dated May 14, 1986.[2] All other questions must be answered if Schlichtman is again deposed.

■ Since appellant does not here challenge the subpoena of October 16, 1984, we offer no ruling on it. To assist the district court regarding requests for further discovery of privileged matter, we offer the following guidelines in light of plaintiffs' interest in their communications with their attorney.

First, defendants' should demonstrate that the material to be discovered is relevant to their case. This showing should include an articulation of how the material could assist the preparation of their defense in a meaningful way. A showing comparable to that presented regarding the contents of discussion to which Nims was privy would be sufficient. Secondly, defendants should demonstrate why it would be unreasonably difficult for them to obtain the information elsewhere or that redundant evidence will be helpful to their case. They do not have to prove that it is absolutely unavailable from other sources. Of course, the more the requested discovery would intrude into the privilege, the greater should be the showing of need and lack of reasonable alternative sources.

Since this opinion clarifies appellant's obligation under the district court's order of August 1, 1985 and requires revision of the deposition notice which led to the present contempt charges, we vacate the present order holding Schlichtmann in contempt

---

**2.** These questions are:

16. As part of your legal strategy in this case, did you ever advise any client to alter his or her appearance in any way?

17. If so, please identify the individual(s) to whom you gave that advice, the instructions you gave, and indicate whether, to your knowledge, the individual carried out your advice.

18. As part of your legal strategy, did you decide to present only one individual to testify?

19. When was that decision made?

20. To whom did you communicate that decision?

21. Which individual had you selected to testify?

22. Did you ever communicate your decision to call only one witness to anyone other than the individuals you were representing?

23. If so, please indicate the names and addresses of the individuals to whom you communicated this information.

30. Please provide a copy of your file in the matter of *State v. Bottome, et al.*

without prejudice to the district court's right to hold him in contempt in the future should he refuse to answer the same questions (except those listed in note 2, *supra*)[3] or should he refuse to answer other questions which the district court may in the future determine are appropriate after engaging in the balancing process described herein.

*Vacated and remanded* for proceedings consistent with this opinion.

---

3. Our holding with respect to these questions is limited to determining that a proper justification has not been made on the present record. We do not rule out the possibility that the district court will require answers to such questions in the future upon an adequate showing by defendants under the principles described herein.