CLAIRE M. CLAIR, executrix,[1] & another[2] vs. JOSEPH P. CLAIR
& others.[3]

Suffolk. October 4, 2012. - January 25, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Privileged Communication. Evidence,* Privileged communication. *Attorney at Law,* Attorney-client relationship. *Corporation,* Close corporation. *Waiver.*

In a civil action seeking, inter alia, a judgment declaring the ownership rights in the defendant companies, the plaintiff, who was the wife of a deceased director and shareholder and executrix of his estate, was not entitled to compel testimony and the production of documents on a wide range of matters pertaining to the operation of the companies from their legal counsel, where the plaintiff did not automatically assume the decedent's role as a director with access to all privileged communications [214-218]; however, the plaintiff was entitled to discovery of certain privileged communications, unavailable from any other source, that specifically related to certain life insurance polices, where the companies had placed such information at issue in their counterclaim and thereby had waived the attorney-client privilege [218-221].

CIVIL ACTION commenced in the Superior Court Department on April 9, 2010.

A motion to compel testimony and the production of documents was heard by *Peter M. Lauriat,* J.

A proceeding for interlocutory review was heard in the Appeals Court by *Gary S. Katzmann,* J., and the appeal was reported by him to that court. The Supreme Judicial Court on its own initiative transferred the matter from the Appeals Court.

*William P. Breen, Jr.,* for 2003 Clair, LP, & others.

---

[1] Of the estate of James E. Clair, Jr.

[2] Jane M. Clair, executrix of the estate of Mark J. Clair.

[3] Michael S. Clair, and twenty-six business entities comprising what is commonly known as the Clair Auto Group. With regard to Joseph P. Clair and Michael S. Clair, each is being sued "individually and in his capacity as an officer, director, member, manager, limited and/or general partner and/or shareholder" of the various entities constituting the Clair Auto Group. Along with the defendants, Sovereign Bank is designated on the complaint as "Trustee."

*Nicholas D. Stellakis* (*Harry L. Manion, III, Jennifer B. Furey, & David M. Fox* with him) for Claire M. Clair.

SPINA, J. This case arises from a family dispute among the owners of twenty-six business entities (collectively, companies) that were established in connection with the operation of the Clair Auto Group, a chain of automobile dealerships. When the family patriarch, James E. Clair, Sr., died in 2004, his four sons — James E. Clair, Jr.; Mark J. Clair; Joseph P. Clair; and Michael S. Clair (collectively, Clair brothers) — held approximately equal ownership interests in the companies. In November, 2007, the Clair brothers sold most of the companies' dealerships, real estate, and other assets to Prime Motor Group (Prime Motors). A few years thereafter, following the deaths of two of the Clair brothers, family relationships began to deteriorate.

On April 9, 2010, Claire M. Clair, the executrix of the estate of her husband, James E. Clair, Jr., and Jane M. Clair, the executrix of the estate of her husband, Mark J. Clair (together, the plaintiffs), brought an action in the Superior Court against Joseph P. Clair, Michael S. Clair, and the companies (collectively, the defendants),[4] challenging the disposition of business assets that remained after the 2007 sale to Prime Motors. In connection with their civil action, Claire unsuccessfully sought, through service of subpoenas duces tecum, testimony and documents from James C. Jones, the companies' general counsel, and from Robert E. Richards, Jr., the companies' outside counsel (together, corporate counsel). The basis for the lawyers' noncompliance with the subpoenas was attorney-client privilege.[5] On March 11, 2011, Claire filed a motion to compel testimony and the production of documents from corporate counsel. Following a hearing, a judge allowed Claire's motion on May 17, 2011.[6] The companies then filed a petition for interlocutory relief pursuant to

---

[4]Because they share a surname, we refer to the Clair brothers by their first names.

[5]The applicability of the work product doctrine is not at issue in this appeal. See note 27, *infra.*

[6]In her memorandum in support of her motion to compel, Claire noted that because her subpoenas were at issue, she was the party who had filed the motion. Nonetheless, she said that the judge's order also should apply to Jane, as executrix of Mark's estate, because Jane was in the same position as Claire in attempting to obtain information from corporate counsel. In his memorandum

G. L. c. 231, § 118, first par., with a single justice of the Appeals Court. The single justice allowed the petition and reported his decision to a panel of that court.[7] We transferred the case to this court on our own motion. For reasons slightly different from those articulated by the judge below, we affirm the order of the Superior Court, subject to specified limitations.[8]

1. *Background.* For purposes of the present appeal, the facts are drawn from the allegations in the plaintiffs' verified second amended complaint, the motion judge's memorandum of decision and order on Claire's motion to compel, and relevant documents in the record.

During a span of fifty years, James E. Clair, Sr., built the Clair Auto Group from a single Buick dealership in the West Roxbury section of Boston into one of New England's largest automobile dealership chains. The companies are comprised of closely held corporations, limited partnerships, trusts, and limited liability companies.[9] Over time, the Clair brothers entered the family business and became directors, officers, shareholders, partners, and members of the companies. As of 2004, the year their father died, each brother's ownership share of the companies was approximately twenty-five per cent. A majority of the companies' valuable assets were held by Clair International, Inc. (Clair International), and Clair, L.P. (Clair LP).

Pursuant to a 1998 stockholders' agreement for Clair International (stockholders' agreement),[10] James, Joseph, and Mark each were required to "apply for, own, and be the beneficiary of life insurance policies on the life of each of the other

of decision and order, the motion judge noted that the issues raised by Claire had equal relevance to Jane, and he seemed to give Jane the same access to privileged communications as he afforded to Claire.

[7] All proceedings in the Superior Court have been stayed pending resolution of the present appeal.

[8] On March 10, 2011, the plaintiffs filed a motion to disqualify Murphy & King, P.C., as counsel for Joseph P. Clair on the ground that the representation presented a conflict of interest. The judge denied the motion. That determination was not before the single justice of the Appeals Court and, consequently, is not before us now.

[9] According to the plaintiffs, the companies are all closely held entities.

[10] The stockholders' agreement for Clair International, Inc. (Clair International), is the only governing document in the record. Therefore, we have no information on the specific provisions of the companies' other governing agreements.

Stockholders (other than James E. Clair, Sr.)" in designated amounts.[11] The stockholders' agreement subsequently was amended on January 1, 2003,[12] and January 1, 2004. As significant here, the final amendment to the stockholders' agreement, dated October 1, 2006, wholly revised the section on life insurance to provide that Clair International would "apply for, own and maintain life insurance policies on the life of each of the Stockholders"; that Clair International or its affiliates "shall be the beneficiary of such policies"; and that Clair International would pay all premiums in connection with the life insurance policies.[13] Ownership of the policies thus was transferred from the individual Clair brothers to Clair International and Clair LP. The life of each brother was insured by two policies. The 2006 amendment to the stockholders' agreement further provided that Clair International was purchasing and maintaining such insurance "as a means to make payment to the estate of a deceased Stockholder for the purchase of all or a portion of the Stock owned by the deceased Stockholder."[14]

After the Clair brothers sold most of the companies' assets to Prime Motors in November, 2007, a majority of the proceeds,

[11] The "Stockholders" were James E. Clair, Sr.; James; Joseph; and Mark. At this time, Michael was not yet a party to the stockholders' agreement.

[12] It appears that Michael became a stockholder of Clair International as of January 1, 2003, when he purchased shares of the corporation from his father. As a consequence, he was added as a party to the stockholders' agreement.

[13] Although not apparent from the language of the 2006 amendment to the stockholders' agreement, the parties agree that ownership of the life insurance policies actually was shared, on a "50/50 basis," by Clair International and Clair LP. We shall refer to both entities when discussing ownership of the policies.

[14] The method for repurchasing the stock of a deceased stockholder is set forth in paragraph 1.6A of the 2006 amendment to the stockholders' agreement, which states: "At the death of any Stockholder his Personal Representatives shall be deemed to have offered to sell to the Company all of such Stockholder's Stock at the Agreement Price and on the Agreement Terms and the Company shall buy all of the Stockholder's Stock at the time of his death. Any proceeds from life insurance *owned by the Company* on the life of the deceased Stockholder shall be paid to the estate of the deceased Stockholder in one lump sum and applied against all or a portion of the Agreement Price. Any balance of the Agreement Price due to the estate of the deceased Stockholder shall be paid to the estate of said deceased Stockholder on the Agreement Terms." (Emphasis added.) The "Agreement Price" is the fair market value of the stock as agreed on yearly by all the stockholders or as determined through a specified appraisal procedure.

totaling approximately $80 million, were distributed to the shareholders. The companies' remaining assets consisted of, among other things, money held in a reserve account,[15] funds to service warranty claims, and several parcels of real estate. In addition, Clair International and Clair LP continued to own the life insurance policies. However, once Prime Motors purchased substantially all of the assets of the companies, it no longer was necessary for Clair International and Clair LP to maintain the life insurance policies on the Clair brothers in order to be able to fund a buyout of a deceased shareholder's stock. After receiving advice from corporate counsel, Clair International and Clair LP offered each shareholder the opportunity to purchase the policies individually.[16] The purchase price would be established in accordance with each policy's interpolated terminal reserve (ITR) value.[17] The purchase and transfer of the life insurance policies to the Clair brothers was arranged by, among others, the companies' outside counsel.

Mark died suddenly on December 1, 2007, shortly after the closing on the sale of the companies' assets to Prime Motors, but before the completion of the necessary paperwork to effectuate the transfer of his insurance policies from Clair International and Clair LP. Mark's ownership interests in the companies passed to his estate. According to the plaintiffs, at a

---

[15]As a condition of the 2007 sale to Prime Motors, the companies established a reserve account at Sovereign Bank that was intended to address any postsale claims that could be asserted by Prime Motors over the subsequent two years. The companies' obligation to maintain and fund the reserve account terminated on November 21, 2009. As of that date, there were no pending claims, so the approximately $2.5 million in the reserve account was available for distribution to the shareholders. According to the plaintiffs, no such distributions have been made.

[16]According to Clair International and Clair LP, James was diagnosed with cancer during the spring of 2006. He began treatment, and the cancer appeared to go into remission. Around September, 2007, James learned that the cancer had returned. In the defendants' view, James was the driving force behind the decision to transfer ownership of the life insurance policies from Clair International and Clair LP to the individual Clair brothers.

[17]The interpolated terminal reserve is "the reserve value which the company keeps on its books against its liability on the contracts plus the adjustment of the reserve to the specific date in question." *Estate of DuPont* v. *Commissioner of Internal Revenue*, 233 F.2d 210, 212 (3d Cir.), cert. denied, 352 U.S. 878 (1956). "It is, in fact, the insurer's valuation of the contract." *Commissioner of Internal Revenue* v. *Edwards*, 135 F.2d 574, 576 (7th Cir. 1943).

special shareholders' meeting held on December 10, 2007, the three surviving Clair brothers and corporate counsel acknowledged and confirmed that Clair International and Clair LP had entered into binding agreements to transfer ownership of the life insurance policies to the individual Clair brothers, each of whom would pay the ITR values of his respective policies.[18] Thus, when the life insurance proceeds for Mark were paid by the insurers, Joseph, on behalf of Clair International and Clair LP, indorsed the checks (totaling $12 million) to Mark's estate in exchange for payment of the policies' ITR values. The companies made no claim at that time that Mark's estate must surrender his shares of the companies.

Joseph and Michael, on behalf of Clair International and Clair LP, also executed documents transferring ownership of James's life insurance policies to irrevocable trusts that he had created.[19] Outside counsel directed James to remit one-half of the policies' ITR values to Clair International and the other half of the policies' ITR values to Clair LP, and those payments were made immediately. The irrevocable trusts created by James thereafter paid the individual premiums on his life insurance policies. James then died on March 4, 2008. His ownership interests in the companies passed to his estate. The insurers paid approximately $12 million in life insurance proceeds to the irrevocable trusts that James had created. The companies made no claim at that time that James's estate must surrender his shares of the companies.

Following their brothers' deaths, Joseph and Michael remained in control of the companies, managing the assets that remained after the 2007 sale to Prime Motors. Over the next two years, they routinely treated the plaintiffs as shareholders who held the same ownership interests as their late husbands, provided them with financial information about the companies, involved them in various aspects of corporate decision-making, and distributed profits to them on a periodic basis. This apparently cordial

---

[18]Outside counsel is unable to locate copies of the minutes for the December 10, 2007, special shareholders' meeting, or for a meeting held in November, 2007.

[19]In addition, according to the plaintiffs, Joseph and Michael executed documents transferring ownership of their life insurance policies from Clair International and Clair LP to themselves or their designees.

relationship began to deteriorate in early 2009, when Joseph and Michael sought to gain ownership of the plaintiffs' interests in the companies, for little or no consideration, under a variety of legal theories. Pursuant to one theory, the shares that had been held by Mark and James were deemed to have been tendered back to the companies on their deaths under the buyout provision of the stockholders' agreement, and the life insurance proceeds paid to each estate constituted payment for the repurchase of those shares.[20] Therefore, in the view of Joseph and Michael, the plaintiffs had not been shareholders of the companies since the deaths of their husbands.

Around the same time that Joseph and Michael were attempting to gain ownership of the shares that had been held by Mark and James, Claire was requesting financial information about the companies' income and expenses. The information that was provided by outside counsel suggested to Claire that substantial disbursements had been made for what appeared to be personal, rather than business-related, expenses. This ongoing family dispute reached its culmination when the plaintiffs filed their action against the defendants in the Superior Court, seeking, among other things, a declaratory judgment pursuant to G. L. c. 231A as to their ownership rights in the companies.[21]

In the defendants' answer to the plaintiffs' complaint, Clair International and Clair LP asserted separate counterclaims against Claire[22] and Jane,[23] both individually and in each one's capacity

---

[20]We note that, at the time of James's death, the life insurance policies no longer were owned by Clair International and Clair LP such that their proceeds could be used to repurchase James's stock in accordance with paragraph 1.6A of the 2006 amendment to the stockholders' agreement. See note 14, *supra.*

[21]In their verified second amended complaint, the plaintiffs also asserted claims for breach of fiduciary duty (Count II), accounting (Count III), trustee process attachment (Count IV), breach of contract (Count V), breach of the implied covenant of good faith and fair dealing (Count VI), and specific performance (Count VII). In addition, Jane asserted a claim for promissory and equitable estoppel (Count VIII).

[22]As to the counterclaims asserted against Claire, Count I is for breach of fiduciary duty, Count II is for rescission, Count III is for breach of contract — specific performance, Count IV is for declaratory judgment, Count V is for unjust enrichment, and Count VI is for conversion.

[23]As to the counterclaims asserted against Jane, Count I is for breach of contract — specific performance, Count II is for declaratory judgment, Count III is for unjust enrichment, and Count IV is for conversion.

as executrix of her husband's estate.[24] They sought to compel the tender of certain stock and ownership interests in the companies, and the return of monies improperly paid in excess of that to which each estate was entitled under the stockholders' agreement. Michael filed a separate answer to the plaintiffs' complaint and asserted a counterclaim against Claire,[25] in her capacity as executrix of her husband's estate, alleging that James had breached his fiduciary duty to Michael and others.[26]

In light of these counterclaims, Claire pursued discovery on a broad range of matters pertaining to the management of the companies. On June 25, 2010, she served subpoenas duces tecum on corporate counsel, seeking both testimony and documents concerning, among other things, the valuation, purchase, and sale of the life insurance policies by the companies to the Clair brothers; the ownership interests in the companies from 2005 to the present; the 2007 sale of the companies' assets to Prime Motors; the appraisals of the companies' former and current assets; the companies' financial statements; and the various documents pertaining to the governance of the companies. Attorney Richards objected to his subpoena on the grounds that it sought testimony and documents that were "protected by the attorney-client privilege and/or the work product doctrine." Claire's counsel was able to take the deposition testimony of

---

[24]We note that the counterclaims asserted by Clair International and Clair LP are presented in the defendants' answer to the plaintiffs' verified amended complaint, not in their answer to the plaintiffs' verified *second* amended complaint. Nonetheless, the motion judge treated the counterclaims raised by Clair International and Clair LP as still in effect, notwithstanding their failure to raise them in response to the second amended complaint.

[25]This counterclaim is presented in Michael's answer to the plaintiffs' verified *second* amended complaint.

[26]Michael alleged that James had breached his fiduciary duty to Michael and others by (1) failing to properly and fairly value his life insurance policies as of their date of transfer; (2) failing fully and fairly to disclose any potential tax liability to Michael and others as a consequence of the transfer of his insurance policies; (3) failing to disclose the extent of his illness; (4) failing to disclose that the transfer of the insurance policies at less than fair market value would create tax issues and potentially jeopardize "Sub Chapter S status" in violation of the stockholders' agreement; (5) potentially failing to recuse himself from voting on the transfer of the insurance policies; (6) failing fully and fairly to disclose the actual terms of his proposal to transfer the insurance policies; and (7) seeking payment above and beyond that to which he was entitled as a result of his ownership interests in the companies.

Attorney Jones on September 23, 2010. However, according to Claire, nothing of substance was elicited because Jones's lawyer objected to nearly every question on the basis of attorney-client privilege.

On March 11, 2011, Claire filed a motion to compel testimony and the production of documents from corporate counsel pursuant to Mass. R. Civ. P. 37, as amended, 423 Mass. 1406 (1996). Claire first asserted that, once she stepped into James's shoes as executrix of his estate, she was within the companies' attorney-client privilege. As such, she was entitled to the same privileged information to which James, as a director, officer, shareholder, partner, and member of the companies, would have had access. Second, Claire asserted that she was entitled to all privileged communications regarding the valuation, purchase, and sale of the life insurance policies from Clair International and Clair LP to the Clair brothers, including legal advice from corporate counsel, because the defendants had placed such information at issue in their counterclaims, thereby waiving attorney-client privilege.

In allowing Claire's motion to compel, the judge first agreed with Claire's argument that, as executrix of James's estate, she held his privilege with respect to all communications with corporate counsel prior to his death. In the judge's view, there was no dispute that Claire stood in James's shoes, that the attorney-client privilege belonged to the companies, and that corporate counsel therefore had information that all shareholders were entitled to obtain. As such, the defendants could not assert attorney-client privilege with respect to communications between corporate counsel and any member of this group in connection with the business of the companies. The judge next stated that the matter was "more nuanced" with respect to communications that occurred between the defendants and corporate counsel following James's death. In the judge's view, Claire's argument that she was entitled to this information was premised on her contention that she was a shareholder. However, any determination of Claire's status as a shareholder rested on the information that she sought to compel from corporate counsel. According to the judge, given that the issues in this case centered around disputes among the shareholders and their successors,

the information and documents in the possession of corporate counsel had to be equally available to all parties. The judge therefore concluded that corporate counsel could not avoid testifying at a deposition by asserting a blanket attorney-client privilege. At a minimum, the plaintiffs were entitled to explore the circumstances and claimed bases for the invocation of the privilege, and to be given a privilege log with respect to each and every document that corporate counsel sought to withhold on the basis of attorney-client privilege.[27]

2. *Standard of review.* "The focus of appellate review of an interlocutory matter is 'whether the trial court abused its discretion — that is, whether the court applied proper legal standards and whether the record discloses reasonable support for its evaluation of factual questions.' " *Caffyn* v. *Caffyn*, 441 Mass. 487, 490 (2004), quoting *Edwin R. Sage Co.* v. *Foley*, 12 Mass. App. Ct. 20, 25 (1981). "On appeal from any decision on [an attorney-client] privilege claim, we review the trial judge's rulings on questions of law de novo." *Commissioner of Revenue* v. *Comcast Corp.*, 453 Mass. 293, 302 (2009). An appellate court may affirm a correct result based on reasons that are different from those articulated by the judge below. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997); *Aetna Cas. & Sur. Co.* v. *Continental Cas. Co.*, 413 Mass. 730, 734-735 (1992). "It is well established that, on appeal, we may consider any ground apparent on the record that supports the result reached in the lower court." *Gabbidon* v. *King*, 414 Mass. 685, 686 (1993), and cases cited.

3. *Circle of attorney-client privilege.* The companies contend that the judge erred in concluding that Claire, either in her capacity as executrix of James's estate or as a putative shareholder, is entitled to discovery of the companies' confidential and privileged communications with corporate counsel. They assert that the attorney-client privilege belongs to the companies,

---

[27]The judge's decision to allow Claire's motion to compel was based on his analysis of the applicability of the attorney-client privilege, not the work product doctrine. Similarly, in their briefs in the present appeal, the parties have focused their arguments entirely on the attorney-client privilege. Accordingly, we do not consider whether, absent a waiver of the attorney-client privilege, the documents requested in the subpoenas duces tecum would be undiscoverable pursuant to the work product doctrine.

not to James, and that Claire did not become part of the circle of privilege simply because she became the executrix of James's estate on his death. In the companies' view, Claire did not step into James's corporate shoes such that she now can access privileged communications between the companies and corporate counsel. We agree.

It is well established that "the attorney-client privilege shields from the view of third parties all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice." *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.,* 449 Mass. 444, 448 (2007). See *Upjohn Co.* v. *United States,* 449 U.S. 383, 390 (1981) (attorney-client privilege exists "to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice"). We consistently have held that the privilege is to be construed narrowly. See *Commissioner of Revenue* v. *Comcast Corp., supra* at 304; *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda),* 425 Mass. 419, 421 (1997); *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1),* 424 Mass. 430, 457 n.26 (1997). The party asserting attorney-client privilege has the burden of establishing that the privilege applies to the communications at issue.[28] See *Commissioner of Revenue* v. *Comcast Corp., supra; Suffolk Constr. Co.* v. *Division of Capital Asset Mgt., supra* at 450 n.9.

As a general proposition, "[a] lawyer employed or retained

---

[28]In *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda),* 425 Mass. 419, 421 (1997), we explained that the claimant's burden of proving the existence of attorney-client privilege "extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including (1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived." Claire has not challenged either the existence of an attorney-client relationship between the companies and corporate counsel, or the existence of an attorney-client privilege protecting the communications at issue. Moreover, she is not seeking to waive the attorney-client privilege. Instead, Claire asserts that, as executrix of James's estate, she is within the scope of the privilege because she possesses all the same rights that James did at the time of his death.

by an organization represents the organization acting through its duly authorized constituents." Mass. R. Prof. C. 1.13 (a), as appearing in 450 Mass. 1301 (2008). We have recognized that "[a]n attorney for a corporation does not simply by virtue of that capacity become the attorney for . . . its officers, directors or shareholders." *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 522, cert. denied, 493 U.S. 894 (1989), quoting 1 R.E. Mallen & J.M. Smith, Legal Malpractice § 7.6 (3d ed. 1989). To the contrary, "attorneys serving as counsel to a corporation owe a duty to act according to the interests of the corporation and not in the interests of a nonclient stockholder, director, officer, employee, or other representative of the corporation." *Id.* at 524 n.5. See *Evans* v. *Artek Sys. Corp.*, 715 F.2d 788, 792 (2d Cir. 1983) ("A 'corporate attorney' — whether an in-house lawyer or a law firm that serves as counsel to the company — owes a duty to act in accordance with the interests of the corporate entity itself. His client is the corporation"). See also 1 W.M. Fletcher, Cyclopedia of Corporations § 25, at 54 (rev. ed. 2006) ("a duly organized corporation enjoys a legal identity separate and apart from its shareholders, directors and officers"). Accordingly, the attorney-client privilege belongs to the organization, not to each director, officer, or shareholder. See generally *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989) ("counsel for closely held corporation does not by virtue of that relationship alone have an attorney-client relationship with individual shareholders").

It follows that the power to assert or waive "the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n* v. *Weintraub*, 471 U.S. 343, 348 (1985). The Massachusetts Business Corporation Act (Act) provides that "[a]ll corporate power shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, its board of directors, subject to any limitation set forth in the articles of organization or in [a shareholder] agreement."[29] G. L. c. 156D, § 8.01 (*b*). See *Kelly* v. *Citizens Fin. Co. of Lowell*, 306 Mass.

---

[29]The stockholders' agreement does not set forth any details regarding the powers of, or limitations on, the board of directors of Clair International.

531, 532 (1940) (authority to manage business affairs of corporation vested in board of directors). See also *Symmons* v. *O'Keeffe*, 419 Mass. 288, 298 n.10 (1995) (individual directors not entitled to waive company's attorney-client privilege as to communications with corporate counsel). The corporate managers "must exercise the [attorney-client] privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals." *Commodity Futures Trading Comm'n* v. *Weintraub, supra* at 349. See *Robertson* v. *Gaston Snow & Ely Bartlett, supra.*

Contrary to Claire's contention, she did not simply assume James's role as a director of the companies when, on his death, she became the executrix of his estate. Pursuant to the plain language of the Act, the directors of a corporation "shall be elected at the first annual shareholders' meeting and at each annual meeting thereafter unless their terms are staggered." G. L. c. 156D, § 8.03 (*d*). Claire has not alleged that she has been elected to serve as a director of the companies, which is a necessary precondition to obtaining access to privileged communications given that the attorney-client privilege belongs to the companies, not to each individual director. The fact that Claire steps into James's shoes for purposes of administering his estate,[30] see generally *District Attorney for the Norfolk Dist.* v. *Magraw*, 417 Mass. 169, 172 (1994) (executor of deceased client's estate vested with power to exercise or waive attorney-client privilege on decedent's behalf); *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 483 (1990) (same), does not mean that she automatically assumes his role as a director of the companies with access to privileged communications.

We add that, in his role as a director of the companies, James had an obligation to preserve or waive the companies' attorney-client privilege in a manner that was consistent with his fiduciary duty to act in the companies' best interests. See *Commodity Futures Trading Comm'n* v. *Weintraub, supra* at 348-349. See

---

[30]Arguably, Claire also stepped into James's shoes as a shareholder of the companies, but that matter is in dispute, at least with regard to Clair International in light of the buyout language in the 2006 amendment to the stockholders' agreement.

also G. L. c. 156D, § 8.30 (a) (3) (director obligated to discharge duties "in a manner the director reasonably believes to be in the best interests of the corporation"). If Claire automatically had assumed the position of a director of the companies on James's death, then she would be bound by this same fiduciary duty. The nature of these proceedings is such that Claire seeks access to privileged communications in order to support her lawsuit to protect the interests of James's estate, not the interests of the companies.[31] Thus, not only has Claire not been elected to serve as a director of the companies, but her position is fundamentally inconsistent with being a director.

We conclude that the judge erred in determining that Claire, as executrix of James's estate, stepped into his shoes as a director of the companies and, therefore, was entitled to have access to the companies' privileged communications with corporate counsel. This conclusion, however, is not the end of our inquiry regarding Claire's ability to discover such privileged communications. We now consider whether the companies have waived their attorney-client privilege in a manner that would afford Claire access to at least some of the information that she seeks.

4. *"At issue" waiver.* The companies contend that, contrary to Claire's assertion, they have not placed at issue their privileged communications with corporate counsel regarding the transfer of ownership of the life insurance policies from Clair International and Clair LP to the individual Clair brothers. To the extent that Claire needs certain information to support her claims or defenses, the companies assert that there is nothing in the record to suggest that their privileged communications with corporate counsel are the only sources of information available to Claire. Therefore, they continue, the attorney-client privilege remains firmly intact. Even if that were not the case, the companies argue that the judge failed to limit the scope of discovery to those privileged communications that truly are "at issue."

In *Darius* v. *Boston*, 433 Mass. 274 (2001) (*Darius*), we articulated a general framework for considering the "at issue"

---

[31]The plaintiffs have not brought a derivative suit to enforce a right of the companies. See Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974). See also *Symmons* v. *O'Keeffe*, 419 Mass. 288, 298 n.10 (1995).

waiver doctrine under Massachusetts law. See *McCarthy* v. *Slade Assocs., Inc.*, 463 Mass. 181, 191-192 (2012); *Global Investors Agent Corp.* v. *National Fire Ins. Co.*, 76 Mass. App. Ct. 812, 816-819 (2010). We recognized that there are "certain exceptions to the attorney-client privilege and some circumstances in which the privilege may be deemed waived other than by express waiver." *Darius, supra* at 277. In particular, "a litigant may implicitly waive the attorney-client privilege, at least partly, by injecting certain claims or defenses into a case." *Id.* See Mass. G. Evid. § 523(b)(2) (2012) (privilege waived where person or entity holding privilege "introduces privileged communications as an element of a claim or defense"). See also *Zabin* v. *Picciotto*, 73 Mass. App. Ct. 141, 158 (2008) ("The nature of the defendants' allegations placed the work [the attorney] performed in the underlying litigation directly at issue, and [the attorney] was the only source available to testify regarding the work she performed"). This is the heart of the "at issue" waiver doctrine. See *Darius, supra* at 277-278. Cf. *Greater Newburyport Clamshell Alliance* v. *Public Serv. Co. of N.H.*, 838 F.2d 13, 20 (1st Cir. 1988). "[A] party may resist discovery on the basis of privilege, but may not at the same time rely on the privileged communications or information as evidence at trial." *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 270-271 (1991).

We opined in *Darius* that the scope of an "at issue" waiver is not to be viewed too broadly. See *Darius, supra* at 283. When it is recognized in particular circumstances, an "at issue" waiver "should not be tantamount to a blanket waiver of the entire attorney-client privilege in the case. By definition, it is a limited waiver of the privilege with respect to what has been put 'at issue.' " *Id.* See generally *Commonwealth* v. *Brito*, 390 Mass. 112, 119 (1983) ("Once such a charge [of ineffective assistance of counsel] is made, the attorney-client privilege may be treated as waived at least in part, but trial counsel's obligation may continue to preserve confidences whose disclosure is not relevant to the defense of the charge of his ineffectiveness as counsel"). In addition, "there can be no 'at issue' waiver unless it is shown that the privileged information sought to be discovered is not available from any other source." *Darius, supra* at 284. See

*McCarthy* v. *Slade Assocs., Inc., supra* at 192. See also *Greater Newburyport Clamshell Alliance* v. *Public Serv. Co. of N.H., supra* at 22 (parties seeking to discover privileged communications "do not have to prove that it is absolutely unavailable from other sources").

With this framework in mind, we conclude that the companies effected an "at issue" waiver of their attorney-client privilege regarding communications with corporate counsel about the transfer of the life insurance policies from Clair International and Clair LP to the individual Clair brothers. In Count I of their counterclaims, Clair International and Clair LP allege that "James breached his fiduciary duties to his fellow shareholders by failing to fairly value his insurance policies as of the date of sale, or alternatively, failing to fully and fairly disclose the potential tax liability and consequences of the sale of his insurance policies to his fellow shareholders." As a consequence of James's actions, the Clair brothers "suffered damages and harm." Based on these allegations, the disclosures that James may or may not have made to the Clair brothers and to corporate counsel regarding the life insurance policies, and their related communications about whether to proceed with the transfer of ownership of the policies, are at the heart of proving or disproving the counterclaim.[32] The substance of these communications is essential to determining whether the Clair brothers were fully and accurately informed about the material facts and legal effects of the transfers.

Claire's ability to present a defense to this counterclaim hinges on what exactly the Clair brothers knew about the life insurance policies. The only available sources of this information are corporate counsel, Joseph, and Michael, all of whom are within the circle of privilege held by the companies. Arguably, the companies' meeting minutes, particularly those from the special shareholders' meeting held on December 10, 2007, might shed

---

[32]In their answer to the plaintiffs' second amended complaint, the companies have raised affirmative defenses alleging, like their counterclaim, that James's actions with regard to the transfer of the life insurance policies constituted a breach of his fiduciary duties. Although the parties do not discuss the affirmative defenses in their briefs, our analysis of the "at issue" waiver doctrine would be equally applicable both to the affirmative defenses and to the counterclaim.

some light on what the Clair brothers knew about the life insurance policies, but those minutes cannot be located. Contrary to the companies' assertion, simply reading "the contracts" will not enable Claire to ascertain whether the Clair brothers, in fact, had been apprised of the pertinent details concerning the policies. The companies have resisted discovery on the basis of attorney-client privilege, but Clair International and Clair LP have relied on privileged communications about the life insurance policies to support their counterclaim that James breached his fiduciary duties to his fellow shareholders. They cannot have it both ways. Because this counterclaim depends on an assessment of James's disclosures regarding the life insurance policies, and on an assessment of the Clair brothers' actual knowledge about the details surrounding the transfer of those policies, the companies have placed their otherwise privileged communications "at issue." See *Global Investors Agent Corp.* v. *National Fire Ins. Co.*, 76 Mass. App. Ct. 812, 818-819 (2010). Therefore, the attorney-client privilege as to these matters has been waived.

We are mindful that an "at issue" waiver is not "tantamount to a blanket waiver of the entire attorney-client privilege" between the companies and corporate counsel. *Darius, supra* at 283. In her subpoenas duces tecum, Claire sought testimony and documents from corporate counsel on a wide range of matters pertaining to the operation of the companies. Such a discovery request is too broad. We conclude that Claire is entitled to discovery of all privileged communications between the companies and corporate counsel, both testimonial and documentary, that specifically relate to the life insurance policies.[33] It is only as to such information that the attorney-client privilege has been waived.

5. *Conclusion.* The order of the Superior Court judge entered May 17, 2011, allowing Claire's motion to compel testimony and the production of documents from corporate counsel, is af-

---

[33]It appears from the record that subpoenas have been served only on corporate counsel. The waiver of the attorney-client privilege with respect to communications pertaining to the life insurance policies applies with equal force to Joseph and Michael such that they could be deposed regarding their knowledge about those policies.

firmed insofar as the communications relate specifically to the life insurance policies.

*So ordered.*