NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-796

K.T.

vs.

D.T.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After approximately twenty-nine years of marriage, D.T. (husband) and K.T. (wife) were divorced pursuant to a judgment of divorce nisi (divorce judgment) following a three-day trial in the Probate and Family Court held between September and November 2023.  With respect to alimony, the divorce judgment required the husband to pay "base alimony" of $4,000 per week, and "additional alimony" equivalent to twenty percent of his "[g]ross [s]upport [i]ncome" exceeding $977,885 in a given year.[1]

---

[1] The divorce judgment defined the husband's "[g]ross [s]upport [i]ncome" as "Medicare wages as reflected on his W2(s), plus any employer paid retirement match not reflected within [his] Medicare wages, minus any portion of the Medicare wages resulting from the proceeds of a stock sale or stock option exercise/sale for options/shares divided between the parties in this divorce."  The divorce judgment further provided

With respect to the marital estate, the divorce judgment provided for "an approximately equal division" of assets between the parties, with the wife "being made whole" for her share of marital funds that the husband unilaterally transferred to his personal accounts and spent during the pendency of the divorce proceedings.[2]  The husband appeals, challenging the amount of alimony and the division of assets.  We affirm.

Discussion.  1.  Alimony.  The husband contends that the base alimony award of $4,000 per week is excessive, asserting that the judge erroneously relied on his historical cash bonuses and equity-based income (including "outlier" years of "extraordinary" income tied to the COVID-19 pandemic) earned prior to his employer's corporate restructuring and the downsizing of his department in 2023.  We disagree.

"A judge's determination of the 'amount to award [for] alimony generally [is] reviewed for an abuse of discretion.'" Smith v. Smith, 105 Mass. App. Ct. 505, 509 (2025), quoting Cavanagh v. Cavanagh, 490 Mass. 398, 405 (2022).  Although the

_____

that the amount of "additional alimony" to be paid to the wife would be capped at $125,000 per year.

  [2] The judge found that the husband "impermissibly spent" marital funds totaling $312,596.81 during the pendency of the divorce proceedings.  The judge treated those funds as an advance distribution of marital assets to the husband, which was then factored into the distribution of remaining assets between the parties.

2

judge's discretion is broad, see Young v. Young, 478 Mass. 1, 5 (2017), it is subject to the following "parameters" set forth in the Alimony Reform Act (act):  (1) the judge's findings must reflect consideration of "all relevant factors set forth in G. L. c. 208, § 53 (a)"; (2) the amount of alimony generally must "'not exceed the recipient's need or 30 to 35 per cent of the difference between the parties' gross incomes,' G. L. c. 208, § 53 (b)"; and (3) in determining each party's income for purposes of calculating alimony, "the judge should generally consider all income sources except for those excluded by G. L. c. 208, § 53 (c)."  Smith, supra.  "Moreover, the act did not alter the longstanding principle that, 'where the supporting spouse has the ability to pay, the recipient spouse's need for support is generally the amount needed to allow that spouse to maintain the lifestyle he or she enjoyed prior to termination of the marriage'" (emphasis omitted).  Id., quoting Cavanagh, supra at 407-408.

Here, the judge made findings reflecting appropriate consideration of all relevant § 53 (a) factors for which evidence was presented.  The judge considered, among other things, the length of the marriage; the parties' economic and noneconomic contributions during the marriage; the wife's lost economic opportunity as a result of the marriage "by leaving the

3

workforce and becoming a stay-at-home parent in 2008";[3] the "upper-class and affluent" lifestyle enjoyed by the parties during the last fifteen years of the marriage; the husband's ability to "maintain the marital lifestyle from his employment income," which "significantly exceed[ed]" his personal weekly expenses of $8,722; and the wife's inability to maintain the marital lifestyle as reflected by her weekly shortfall of approximately $6,000 after deducting her credible weekly expenses from her weekly net employment income.[4]

The judge also made extensive findings regarding the husband's employment and income. She found that he has been employed as the head of mergers and acquisitions for a publicly traded company since 2014. The company underwent corporate restructuring in early 2023: a portion was sold to a private equity firm and the remaining portion (where the husband continued to work at the time of trial) was renamed in May 2023. Although the husband's department was downsized following the corporate restructuring, he retained the same title, job duties,

_____

[3] The wife earned $99,711 in 2008 before leaving the workforce to raise the parties' children. The wife was earning approximately $26,500 annually at the time of trial in late 2023.

[4] The judge found the wife to be appropriately employed, earning a net weekly income of $403.68, with credible weekly expenses of $6,399.46.

and compensation structure consisting of (1) a base salary of $485,000 per year; (2) fluctuating annual cash bonus of up to sixty percent of his base salary, with the maximum being $291,000 per year, depending on "both personal and company performance"; and (3) fluctuating equity based compensation (comprised of stock options, restricted stock, and performance restricted stock units).

The judge looked at the last seven years of the husband's earnings (2017-2023), finding that he earned a cash bonus every year since 2017 (with the lowest being $231,472 in 2020) and equity-based compensation every year since 2018 (ranging from $46,249 to $664,354). The judge credited the husband's testimony that his stock options granted in 2021 and 2022 had a negative value, and that his cash bonuses and equity-based compensation had declined from the prior temporary surge experienced during the COVID-19 pandemic. The judge nevertheless found that the husband had "demonstrated an ability to earn at least $997,885 per year" since 2017, and credited documents in evidence from the husband's company showing that his total target compensation for 2023 was over $1.5 million ($485,000 salary, $291,000 bonus, and $776,000 equity compensation).[5] The judge declined the husband's request to

_____

[5] This documentary evidence included a January 2023 letter signed by the Chief Executive Officer (CEO) of the prior

5

calculate the base alimony award using only his base salary, while reserving all other forms of income (including annual cash bonuses and equity-based compensation) for calculating his additional alimony obligation on an if, as, and when received basis.  Instead, the judge found that a "$4,000 weekly base alimony order is appropriate and a fair balance of sacrifice based upon [the] [h]usband's first $997,885 in gross income," noting that the base award was equivalent to 21.4 percent of the parties' income differential.

The husband contends that the judge erred by considering his historical earnings prior to the corporate restructuring (including several outlier years of exceptionally high income tied to the COVID-19 pandemic), while ignoring evidence of bleak earning prospects with the "underperforming" new corporate entity.  We disagree.

Where, as here, the payor spouse's income has fluctuated widely, the judge may consider the payor's earning history and use "an average of the [payor's] past earnings as a basis for

corporate entity that employed the husband from 2014 to early 2023 -- which CEO continued to be the husband's "boss" following the corporate restructuring that occurred in the first half of 2023.  The husband acknowledged that the January 2023 letter "codifie[d] [his] compensation" for 2023, and remained "in effect for one year," including after the new corporate entity became the husband's employer.  The husband's own testimony established that his compensation package was essentially unchanged by the corporate restructuring.

determining the [payor's] present earning capacity." Davae v. Davae, 100 Mass. App. Ct. 54, 59 (2021). The husband claims that it was error to do so in this case because he was working for a different corporate entity at the time of trial and he would not be able to replicate his prior earnings. The corporate restructuring did not, however, result in a change to the husband's title or compensation package (indeed, he retained the same base salary of $485,000, target cash bonus of $291,000, and equity-based compensation structure).

The husband claims that the judge improperly "assumed" he would receive his full cash bonus of $291,000 in 2024, despite that "he had testified that he did not expect to receive a bonus." Contrary to the husband's assertion, however, he did not testify that he would receive no bonus. Rather, he testified that he did not expect to receive a "full bonus" for 2024, and it was his understanding that he might only receive sixty percent of his $291,000 target cash bonus because the new company was allegedly underperforming. Although the judge ultimately declined to credit this testimony, and we see nothing in the record that would warrant disturbing that credibility determination, see Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995), we nevertheless note that were the husband to only receive sixty percent of his target cash bonus (i.e., $174,600), his total gross income for 2024 would be at least $659,600.

7

This would result in an income differential of $633,100 per year (or $12,175 per week) after deducting the wife's annual income of $26,500. The amount of base alimony awarded by the judge of $4,000 per week amounts to approximately thirty-three percent of that income differential, placing it squarely within the act's percentage cap. See G. L. c. 208, § 53 (b) (alimony shall not exceed recipient's need or thirty to thirty-five percent of parties' income differential). Thus, even if the husband earned only sixty percent of his target bonus as he claimed to expect for 2024, the base alimony award would exceed neither the wife's need (approximately $6,000 per week) nor the percentage cap set forth in § 53 (b).[6] Indeed, he would only have to receive approximately forty-seven percent of his target cash bonus for the base alimony award to remain within the statutory parameters (without taking into account any equity-based income that he might receive).

Because the judge did not credit the husband's testimony regarding his bonus for 2024, and the judge was entitled to rely on evidence of the husband's past earnings (including his

---

[6] Only if the husband earned less than $620,786 per year (or $11,938 per week) would the $4,000 weekly base alimony award exceed the percentage cap set forth in § 53 (b). Thus, after deducting his base salary of $485,000, he needs to earn additional income of at least $135,786 (which is roughly 46.7 percent of his target cash bonus).

consistent receipt of cash bonuses of at least $231,472 since 2017, see Davae, 100 Mass. App. Ct. at 59, the husband's argument essentially boils down to a challenge of the weight of the evidence -- a matter left to the judge's sound discretion. See J.M. v. C.G., 492 Mass. 459, 467 (2023) ("[a]bsent clear error, we will not substitute our weighing of the evidence for that of a trial judge who had the opportunity to observe the witnesses and form conclusions about their credibility" [quotation omitted]). It was appropriate for the judge to rely on the evidence before her at the time of trial, and if the husband experiences a material postdivorce decline in his income, as he predicted, he is free to file a complaint for modification seeking a reduction in alimony. See Emery v. Sturtevant, 91 Mass. App. Ct. 502, 507-508 (2017) (alimony may be modified upon material change in circumstances, such as decline in payor's income).

We accordingly discern no abuse of discretion in the alimony award where, as here, the judge's findings reflect appropriate consideration of the relevant § 53 (a) factors, and the amount exceeds neither the wife's need nor the percentage cap in § 53 (b). See Smith, 105 Mass. App. Ct. at 511. See also Clair v. Clair, 464 Mass. 205, 214 (2013), quoting Gabbidon v. King, 414 Mass. 685, 686 (1993) (appellate court "may

9

consider any ground apparent on the record that supports the result reached in the lower court").[7]

2. _Property division_. The husband next contends that the judge, despite intending to effectuate an "approximately equal division" of assets, ultimately divided the marital estate inequitably by (1) reimbursing the wife for expenditures made by the husband that the judge erroneously found were "unauthorized"; and (2) failing to require the wife to be

_____

[7] We are likewise unpersuaded by the husband's contention that the judge engaged in "impermissible 'double-dipping'" by treating his equity-based compensation "both as a substantial component of his expected annual income [for purposes of alimony] and as a divisible asset of the marital estate." There is no double-dipping where, as here, "it is possible . . . to identify . . . separate bases of the property assignment and any alimony or support obligations (thus avoiding redistribution by an alimony . . . order of specific assets that already have been equitably assigned)." Ferhm-Cappuccino v. Cappuccino, 90 Mass. App. Ct. 525, 528 n.5 (2016). The judge permissibly considered the husband's historical earnings (including his past receipt of equity-based compensation) when determining his present earning capacity for purposes of alimony. See Davae, 100 Mass. App. Ct. at 59. The judge did not, however, order the husband to pay future alimony from equity-based compensation that he received prior to the divorce. To the contrary, the judge specifically excluded from the husband's "[g]ross [s]upport [i]ncome" any "proceeds of a stock sale or stock option exercise/sale for options/shares divided between the parties in th[e] divorce." See G. L. c. 208, § 53 (c) (1). The judge's findings and the divorce judgment clearly reflect that the husband's alimony obligation is to be satisfied with his prospective, postdivorce income (including equity-based compensation received in the future).

equally responsible for any shared tax liabilities due on the husband's 2023 tax returns if she elected to file separately.[8]

When reviewing the division of marital assets pursuant to G. L. c. 208, § 34, "[a]s long as the judge's findings show that all relevant factors in § 34 were considered, and the reasons for the judge's conclusion are apparent and flow rationally from the findings and rulings, a judge's determination on the equitable division of marital property will not be disturbed." Warnajtys v. Warnajtys, 97 Mass. App. Ct. 690, 692-693 (2020), quoting Williams v. Massa, 431 Mass. 619, 631 (2000). Here, the judge made findings addressing all of the relevant § 34 factors, and the distribution of assets resulted in an "approximately" equal division as intended by the judge. See Warnajtys, supra

_____

[8] We decline to reach the merits of the following additional arguments raised by the husband. With respect to his contention that the judge "adopted extensive portions" of the wife's proposed findings "verbatim" (many of which the husband claims were "erroneous"), thereby failing to demonstrate the requisite badge of personal analysis, see Cormier v. Carty, 381 Mass. 234, 236-237 (1980), our review is hampered by the husband's failure to provide a copy of the wife's proposed findings. See Chokel v. Genzyme Corp., 449 Mass. 272, 279 (2007). Finally, the husband's argument that allocating seventy-five percent of the children's college expenses to him was an abuse of discretion is "too undeveloped to rise to the level of adequate appellate argument." S.S. v. S.S., 104 Mass. App. Ct. 633, 641 (2024). To the extent that we have not specifically addressed other subsidiary arguments in the husband's brief, they likewise were too undeveloped to garner this court's review.

11

at 693 (mathematical precision not required when dividing marital estate).

The husband, however, contends that the division was inequitable because he was improperly ordered to reimburse the wife approximately $174,163 for certain expenditures that the judge erroneously found were "unauthorized." We are unpersuaded. First, we note that the $174,163 payment was intended to effectuate the entire asset division (rather than merely serve as a reimbursement for the wife's share of the dissipated marital funds). Second, to the extent that the husband asserts that many of the so-called "unauthorized" expenditures were actually made on behalf of the parties' children or the wife, the husband failed to provide adequate record citations in his brief pointing to evidence supporting these claims, and we cannot otherwise ascertain whether these claims have merit based on the record before us. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019); S.S. v. S.S., 104 Mass. App. Ct. 633, 639 n.5 (2024). Third, we do not agree with husband's contention that the judge deprived him of an adequate opportunity to explain the expenditures by denying his request to file an updated financial statement on the last day of trial, given that the husband was allowed to testify on redirect regarding any changes to his financial

12

statement.[9]  We accordingly discern no error where, as here, it was the husband's responsibility to explain the expenditures from the account over which he exercised sole control, he was given an opportunity to explain such expenditures, and the judge ultimately found that he failed to provide sufficient credible evidence explaining the expenditures.  See Grubert v. Grubert, 20 Mass. App. Ct. 811, 821 (1985) (judge permissibly drew adverse inferences against husband where "the uncertainty surrounding [his] income and assets [wa]s his own doing; the production of records [wa]s a matter entirely within his control").

We likewise discern no error in the judge's handling of the parties' potential tax liabilities for 2023.  The husband claims that the judge improperly left him to shoulder the burden of paying the parties' shared 2023 tax liability by permitting the wife to unilaterally choose to file separately.  He asserts that the divorce judgment "should have said, one way or another, how the parties should handle their substantial 2023 tax liabilities," and that it was an abuse of discretion for the judge to not address it.  Contrary to the husband's contention,

---

[9] The judge also appropriately denied the husband's request to file an updated financial statement on the third day of trial where the wife was in the midst of cross-examining the husband and had not been provided with a copy of the updated financial statement.

13

however, the divorce judgment did address the parties' potential tax liabilities: if the parties elected to file joint tax returns for 2023, they would be equally responsible for any liability owed and, regardless of their filing status, the wife would be solely responsible for any tax liability incurred in connection with the husband's liquidation of her various stock shares assigned in the divorce. We are unpersuaded by the husband's contention that the judge erred by not reallocating a portion of the husband's 2023 tax liability to the wife if the parties chose to file separately, given that he failed to present evidence to the judge comparing the tax consequences of filing jointly versus separately.[10] See Smith, 105 Mass. App. Ct. at 512 ("[i]f parties do not request the judge to consider particular tax consequences and do not introduce reasonably instructive evidence bearing on those tax issues, the probate judge is not bound to grapple with the tax issues" [quotation omitted]). Cf. Openshaw v. Openshaw, 493 Mass. 599, 614-615 (2024) (where evidence of parties' outstanding tax debt was

---

[10] The only evidence in the record before us pertaining to the husband's potential 2023 tax liabilities was his vague testimony that he expected to have a Federal liability in connection with the sale of securities and a State liability resulting from insufficient paycheck withholding.

14

presented below, judge's failure to explain reasoning for assigning entire debt to husband was error).[11]

Judgment of divorce nisi, dated March 13, 2024, affirmed.

By the Court (Singh, D'Angelo & Hodgens, JJ.[12]),

Clerk

Entered: August 1, 2025.

---

[11] The husband's request for appellate fees and costs is denied. The wife's request for appellate fees is denied; costs shall be taxed to the husband pursuant to Mass. R. A. P. 26 (a), as appearing in 481 Mass. 1655 (2019).

[12] The panelists are listed in order of seniority.